**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CORNHUSKER CASUALTY
COMPANY, a Nebraska corporation,

    Plaintiff Counter Defendant -
    Appellee,

v.

SHARI SKAJ; STEVE SKAJ,

    Defendants Counter Plaintiffs,

and

VINCENT ROSTY,

    Defendant Counter Plaintiff -
    Appellant.

_____

CORNHUSKER CASUALTY
COMPANY, a Nebraska corporation,

    Plaintiff Counter Defendant -
    Appellee,

v.

SHARI SKAJ; STEVE SKAJ,

    Defendants-Counter-Plaintiffs -
    Appellants,

and

VINCENT ROSTY,

    Defendant Counter Plaintiff.

Nos. 13-8004; 13-8010; 13-8014

_____
CORNHUSKER CASUALTY
COMPANY, a Nebraska corporation,

      Plaintiff Counter Defendant -
      Appellant,

v.

SHARI SKAJ; STEVE SKAJ,

      Defendants Counter Plaintiffs -
      Appellees.

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 1:11-CV-00110-SWS)**

Terence M. Ridley of Wheeler Trigg O'Donnell LLP, Denver, Colorado (Evan B. Stephenson and Ryan P. Day of Wheeler Trigg O'Donnell LLP, Denver, Colorado, with him on the briefs), for Plaintiff Counter Defendant - Appellee Cornhusker Casualty Company.

R. Todd Ingram of Ingram Olheiser, P.C., Casper, Wyoming (Scott J. Olheiser of Ingram Olheiser, P.C., Casper, Wyoming, and Timothy W. Miller, Miller Law Firm, Casper, Wyoming, with him on the brief), for Defendants Counter Plaintiffs Shari Skaj and Steve Skaj.

Robert M. Shively, Casper, Wyoming (T. Thomas Metier, Metier Law Firm LLC, Fort Collins, Colorado, with him on the brief), for Defendant Counter Plaintiff - Appellant Vincent Rosty.

Before **HOLMES**, **MATHESON**, and **BACHARACH**, Circuit Judges.

**HOLMES**, Circuit Judge.

Cornhusker Casualty Company ("Cornhusker") appeals from the district court's summary-judgment ruling, arguing that the district court incorrectly concluded that Cornhusker was estopped from asserting noncoverage as a defense to the claims of Shari and Steve Skaj. The Skajs have cross-appealed the district court's sua sponte entry of summary judgment against them on their counterclaim for attorneys' fees. Vincent Rosty has filed a cross-appeal as well,[1] alleging that the district court erred in granting summary judgment to Cornhusker on some of his tort-based counterclaims.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the judgment of the district court. We **deny** the Skajs' pending motion to file a supplemental appendix and **deny as moot** Cornhusker's pending motion to seal the contents of that proposed appendix.

## I

R&R Roofing, Inc. ("R&R") is a Wyoming construction company primarily operated by Randy Rosty and Steven Rosty. In 2007, R&R purchased a Cornhusker commercial liability policy ("the Policy") that took effect on November 27, 2007, and listed "R&R" and "Randy Rosty" as the named insureds.

---

[1] This case involves three individuals with the same surname, "Rosty": Vincent Rosty, Randy Rosty, and Steven Rosty. For clarity's sake, after first introducing each in text by his first name and surname, each is referred to only by his first name. *See, e.g.*, *United States v. Kimler*, 335 F.3d 1132, 1134 n.1 (10th Cir. 2003) ("Because many of the people involved in this case share the same last name, they will, for the most part, be referred to by their first names throughout this opinion.").

3

Vincent, who was an R&R employee at that time, does not appear as a named insured under the Policy.

The Policy includes business automobile coverage with a liability limit of $1,000,000. By its terms, the Policy obligates Cornhusker to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from . . . use of a covered 'auto.'" J. App. at 187 (Bus. Auto. Decls., effective Nov. 27, 2007). It ascribes to Cornhusker the "duty to defend any 'insured' against a 'suit' asking for . . . damages" and defines "insureds" as "(a) You for any covered 'auto' [and] (b) Anyone else while using with your permission a covered 'auto.'" *Id.* Several "covered autos" appear on the Policy's automobile schedule, including as pertinent here, a 1974 Ford F 600 dump truck. *Id.* at 181.

Additionally, the Policy establishes a number of loss conditions. It states, "We have no duty to provide coverage under this policy unless there has been full compliance" with various duties. *Id.* at 192. In particular, after an accident, or after the filing of a claim or lawsuit, the policyholder must promptly notify Cornhusker by "[i]mmediately send[ing] . . . copies of any request, demand, order, notice, summons or legal paper received concerning the claim or 'suit.'" *Id.* A cooperation clause memorializes the policyholder's assent to "[c]ooperate with [Cornhusker] in the investigation or settlement of the claim or defense against the 'suit.'" *Id.*

4

On May 6, 2008, Vincent drove R&R's 1974 Ford F 600 dump truck to the residence of Ms. Skaj to deliver roofing supplies and "to see if his kids were there." *Id.* at 1338 (Order, filed Dec. 11, 2012). Vincent has two children by Ms. Skaj. At some point after Vincent stopped in an alley behind the Skaj residence, the truck (with a manual transmission) was accidentally knocked into second gear. The truck then rolled forward toward Ms. Skaj as she approached and pinned her against a parked motor home, producing serious injuries. A laboratory test performed later that day detected the presence of marijuana and methamphetamines in Vincent's bloodstream.

Within a few days of Ms. Skaj's accident, Cornhusker retained AmeriClaim adjuster Charles Brando to perform an investigation. Mr. Brando sent a report detailing his findings to Cornhusker on May 22, 2008. Among other things, the report described interviews with Vincent, Mr. Skaj, two police officers, Randy, and Steven. In particular, it noted that Vincent had driven "off route . . . to stop at his [e]x's[, i.e., Ms. Skaj's]" residence. *Id.* at 701 (Claim Report, dated May 22, 2008). The report described Randy as being "adamant that [Vincent] was aware of the company policy that the insured vehicles [including the Ford dump truck involved in the accident] are not to be used for personal business," though Randy acknowledged that there were "no written policies on use of company

5

vehicles." *Id.* at 694.[2]

In October of 2008, counsel for the Skajs wrote to Cornhusker to notify it of a forthcoming claim. Cornhusker sent a "[n]otice of potential excess exposure" to R&R, Steven, and Vincent on October 30, 2008, referencing Ms. Skaj's demand for $2,000,000. *Id.* at 339 (Notice, dated Oct. 30, 2008). Besides reporting the possibility of exposure in excess of the Policy's $1,000,000 limit, the notice stated:

> [W]e wish to advise you of your right to retain personal counsel, at your own expense, as pertains to your potential excess exposure. We are not advising that you must retain personal counsel, *as Cornhusker Casualty Company will continue to provide a defense*, but merely to advise you of your right to do so.
>
> It is likely that the [Skajs'] attorney might file a [lawsuit] against you. If you do receive any legal papers, please advise us immediately and send us copies.

*Id.* at 340 (emphasis added).

On November 13, 2008, the Skajs' counsel wrote to Cornhusker—this time in anticipation of litigation. Months later, on April 16, 2009, the Skajs did file a lawsuit in Natrona County, Wyoming, against R&R, Steven, and Vincent. The Skajs asserted several claims sounding in negligence and requested punitive damages based on their allegations that Vincent was intoxicated at the time of Ms.

---

[2] In subsequent testimony, Vincent stated that, although he "didn't really have R&R's permission," he often drove the dump truck for personal business. J. App. at 707 (Dep. of Vincent Rosty, dated Sept. 13, 2012).

Skaj's accident. Service on Vincent was accomplished on April 17, 2009, by delivering a copy of the summons and complaint to his mother. Actually locating Vincent, however, proved more difficult.[3] When Mr. Brando attempted to do so on May 12, 2009, by visiting Vincent's mother's home, he encountered Rosty family members who professed a lack of knowledge both as to Vincent's whereabouts and how to contact Vincent.

At the conclusion of his investigation, Mr. Brando advised Cornhusker about possible ways that Vincent might be reached, specifically:

> to send him three letters to his (mother['s]) Post Office Box[,] . . . one certified-return receipt requested signature required (if he is still getting mail at this Post Office Box), one regular mail (that may be forwarded if he filed a forwarding address), and one Return Service Requested (if he filed a forwarding address and the post office returns the letter with the new mailing address).

Id. at 435 (Supp. Report, dated May 13, 2009) (emphases omitted). The record does not offer any indication that Cornhusker followed Mr. Brando's advice.[4]

Meanwhile, in April of 2009, counsel retained by Cornhusker to defend against the Skajs' lawsuit sought and received an extension of "the answer

---

[3]    Evidence in the record indicates that an attempt was made to contact Vincent in December of 2008 to discuss the Skajs' claim and the results of a drug test he had taken. Vincent apparently "answered [the] phone but denied being there." J. App. at 1017 (Policy Log, dated Dec. 24, 2008).

[4]    During discovery, Cornhusker admitted that "on May 13, 2009, it permitted Mr. Brando to retire his file, but only under the express understanding it could be reopened at a later date." J. App. at 913 (Resps. to Requests for Admission, filed Oct. 29, 2012).

deadline for *all defendants*." *Id.* at 430 (Letter, dated Apr. 29, 2009) (emphasis added). Communication related to that request indicates that defense counsel at that point "d[id] not know if [she would] be representing all of the defendants." *Id.* A few weeks later, defense counsel filed an answer to the Skajs' complaint on behalf of Steven and R&R only, noting, "I do not represent Vincent Rosty." *Id.* at 448 (Letter, dated May 18, 2009). During that time period, Cornhusker reached the conclusion, "[b]ased on the allegations of the complaint and the policy, . . . that Vincent . . . was not entitled to a defense under the policy." *Id.* at 1222 (Dep. of Thomas Mortland, dated Aug. 15, 2012). Cornhusker did not attempt to advise Vincent of its decision at that time not to represent him. More specifically, Vincent later testified via affidavit that he "had no knowledge of the ongoing matter." *Id.* at 1238 (Aff. of Vincent Rosty, dated Nov. 1, 2010).

An entry of default against Vincent issued on May 21, 2009. Over the next year, proceedings stalled as the non-defaulting defendants were dismissed from the litigation and the Skajs sought to recover a judgment as to Vincent. The Wyoming trial court eventually set a default-judgment hearing for September of 2010. At that juncture, Cornhusker hired separate representation for Vincent. Cornhusker's retained counsel for Vincent entered an appearance on September 23, 2010, and opposed the default-judgment proceedings. The state court held a hearing on the matter on September 24, 2010, and, after considering the parties' arguments, announced that it would enter a default judgment in favor of the Skajs

8

and against Vincent. Shortly thereafter, the court issued a default-judgment order assessing a total in damages and costs of $897,344.24 against Vincent.

One week after the default-judgment hearing, Cornhusker sent Vincent a letter purporting for the first time to deny coverage. In support of its decision, Cornhusker stated that, at the time of Ms. Skaj's accident, Vincent: (1) was not a "permissive use[r]" of the dump truck; (2) was not acting within the course and scope of his employment with R&R; (3) was intoxicated; and (4) had misappropriated roofing materials from R&R. *Id.* at 528 (Letter, dated Oct. 1, 2010). It also opined that Vincent had not cooperated with Cornhusker regarding the Skajs' lawsuit. For these reasons, Cornhusker declared that it would not indemnify Vincent for the amount of the default judgment entered against him.

Cornhusker sent another letter to Vincent on October 7, 2010, purporting to "supplement[]" the foregoing correspondence. *Id.* at 533 (Letter, dated Oct. 7, 2010). In this letter, Cornhusker characterized its representation of Vincent at the default-judgment hearing as being (1) pursuant to a reservation of rights, and (2) only "for the limited purpose" of having the trial court's entry of default set aside. *Id.* Further, Cornhusker explained that

> [a]s noted, the retention of [counsel] on your behalf in no way is to be deemed a waiver of any of Cornhusker's rights under the Policy. Cornhusker reiterates its previous denial [of coverage] in this matter, and has filed a declaratory judgment action against you in which it is seeking a declaration from the Court that neither defense nor . . . indemnity are owed to you under the

9

Policy.[5]

*Id.* at 534.

Meanwhile, counsel whom Cornhusker had retained to represent Vincent in the default-judgment proceedings appealed from the default judgment in state court. Ultimately, the Wyoming Supreme Court affirmed the trial court's entry of default judgment, except insofar as it awarded punitive damages. *See Rosty v. Skaj*, 272 P.3d 947, 960 (Wyo. 2012). Cornhusker nonetheless refused to pay the judgment on Vincent's behalf, maintaining that Vincent was not covered by the Policy.

On March 25, 2011, Cornhusker filed suit against Vincent and the Skajs in the United States District Court for the District of Wyoming. Cornhusker sought a declaration that the Policy provided no coverage to Vincent because, *inter alia*, he was not an insured and had not cooperated during the investigation. Vincent responded by counterclaiming against Cornhusker; in doing so, he asserted theories of negligence, intentional infliction of emotional distress, promissory estoppel, and breach of contract. He also alleged bad faith by Cornhusker and requested punitive damages.

The Skajs filed their own counterclaim, seeking a declaration "that Cornhusker [was] required to pay the judgment in the underlying action," J. App.

---

5    In fact, as indicated by the filing date on its complaint in federal district court, Cornhusker actually did not file such an action until March 25, 2011.

10

at 332 (Second Am. Countercl., filed Apr. 2, 2012), and, given Cornhusker's refusal to pay the judgment, attorneys' fees pursuant to Wyo. Stat. Ann. § 26-15-124(c). Noting that Cornhusker had defended Vincent in the underlying action unconditionally—*viz.*, without a reservation of rights—with knowledge of possible grounds to *deny* coverage, Vincent and the Skajs jointly argued that Cornhusker should be estopped from asserting the defense of noncoverage.[6]

All of the parties filed motions for summary judgment, which the district court addressed at a hearing on November 29, 2012. At the conclusion of the proceedings, the court announced that there would be no trial. It declared that Cornhusker was estopped from denying coverage to Vincent because Cornhusker had represented that it *would* provide a defense, never reserved its rights, and did not advise Vincent of its decision to deny coverage until more than sixteen months after the entry of default. However, the district court awarded summary judgment to Cornhusker on Vincent's sundry tort and contract claims. The court also denied the Skajs' claim for attorneys' fees.

A written ruling memorializing the district court's decision issued on December 11, 2012. The judgment—which was entered the next day—ordered Cornhusker to "pay the full amount of the judgment against Vincent . . . and in

---

[6] After the state trial court denied a motion for relief from the default judgment, the Skajs served a writ on Cornhusker in order to garnish the proceeds of the Policy. Cornhusker removed this action to federal court and it was consolidated with the declaratory-judgment action.

11

favor of Shari Skaj and Steve Skaj in the underlying state court action, $822,344.24, indemnifying Vincent . . . for any amount he has previously paid in satisfaction of the underlying judgment." Dist. Ct. Doc. 190, at 1 (J. in Civ. Case, filed Dec. 12, 2012).

Cornhusker filed the instant appeal to challenge the district court's finding that Cornhusker was estopped from denying coverage to Vincent. The Skajs have cross-appealed from the district court's denial of their claim for attorneys' fees. Finally, Vincent has appealed, advocating for reversal of the district court's disposition of his bad-faith and punitive-damages claims.

## II

"We review de novo the district court's grant of summary judgment and apply the same legal standard used by the district court . . . ." *Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1229 (10th Cir. 2015). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we "examine the record and 'all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party.'" *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (quoting *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006)).

Because this is a diversity action,[7] we "apply the substantive law of the forum state," *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014), which, for purposes of this appeal, is Wyoming. "In addition, we review the district court's interpretation and determination of state law de novo." *Berry & Murphy*, 586 F.3d at 808; *see Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 863 (10th Cir. 2009) (noting that "the principles of a cooperative judicial federalism . . . require that courts of appeals review the state-law determinations of district courts de novo" (internal quotation marks omitted)).

### III

This appeal presents three principal questions: (1) whether the district court rightly concluded that Cornhusker was estopped from denying coverage under the Policy to Vincent after assuming his defense without a reservation of rights; (2) whether the district court properly ruled in Cornhusker's favor on Vincent's bad-faith and punitive-damages claims; and (3) whether the district court correctly denied the Skajs' claim for attorneys' fees. We answer each question in the affirmative, ultimately discerning no reversible error in the district court's rulings.

### A

---

[7] As alleged in the complaint, there is complete diversity between Cornhusker (a Nebraska corporation) and each of the parties it sued: the Skajs are citizens of Wyoming, and Vincent is "a citizen of the State of Wyoming or the State of Colorado." J. App. at 36 (Compl., filed Mar. 25, 2011); *see* 28 U.S.C. § 1332(a)(1) (vesting in federal district courts original jurisdiction over actions "between . . . citizens of different States").

**1**

As a threshold matter, we address Cornhusker's contention that Vincent and the Skajs are not entitled to be heard on the issue of estoppel. The district court rejected this line of reasoning, and we do as well.

Cornhusker purports to "raise[] the issue of . . . standing to maintain the suit, and hence [the] Court's jurisdiction to entertain it . . . , [which] would normally be considered a threshold question that must be resolved . . . before proceeding to the merits." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). More to the point, in its opening brief, Cornhusker urges that "[Vincent] and the Skajs lack standing to invoke waiver and estoppel against Cornhusker because they are strangers to the Cornhusker Policy." Cornhusker Opening Br. at 21 (capitalization altered). The crux of Cornhusker's argument is that only named insureds—here, R&R and Randy—should be permitted to invoke theories of waiver or estoppel, whereas in this case

> neither [Vincent] nor the Skajs are parties to the Cornhusker Policy. Nor are they privies of R&R or Cornhusker, the only two parties to the Cornhusker Policy. Additionally, neither [Vincent] nor the Skajs have proved to be an "insured" under the Cornhusker Policy. . . . Accordingly, neither [Vincent] nor the Skajs *have standing to estop* Cornhusker from denying coverage.

*Id.* at 24 (emphasis added) (citations omitted).

Vincent and the Skajs respond that Cornhusker advances a "strained attempt at a standing argument." Skajs' Br. at 20. We agree. Although "standing

14

is a threshold issue in *every* case before a federal court," *Turner v. McGee*, 681 F.3d 1215, 1218 (10th Cir. 2012) (emphasis added) (internal quotation marks omitted), this is because the standing issue implicates a federal court's subject-matter jurisdiction. We have explained that standing controversies involve "constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (internal quotation marks omitted); *accord Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003). Although denominated a matter of standing, Cornhusker's argument is actually of another genus entirely—one that does not implicate a court's jurisdiction. Indeed, it presents no more than a garden-variety question regarding the proper interpretation of the Policy.

As relevant here, the Supreme Court has dispelled the notion that a "'standing' argument [that] simply presents a straightforward issue of contract interpretation" can serve as a legally cognizable "standing" argument. *Perry v. Thomas*, 482 U.S. 483, 492 (1987). Indeed, the *Perry* Court did not countenance a litigant's "argument[,] . . . characterize[d] as one of 'standing,'" when the contention was merely "that [his opponents] were 'not parties' to [an] agreement." *Id.* at 487. We believe *Perry* applies with equal force to this appeal—that is, it makes clear that Cornhusker's purported standing argument does not implicate our subject-matter jurisdiction. In other words, it is not a true

15

standing argument, in the conventional sense, at all.

In sum, Cornhusker has not raised a legally cognizable question of standing that implicates our jurisdiction. We therefore treat the issue of the right to contest coverage under the Policy as the substantive question that it actually is.

**2**

In concluding that Vincent and the Skajs could invoke estoppel to prevent Cornhusker from denying coverage, the district court proceeded from Wyoming's default rule that "the doctrines of estoppel and waiver cannot be employed to expand policy coverage." J. App. at 1348 (quoting *St. Paul Fire & Marine Ins. Co. v. Albany Cnty. Sch. Dist. No. 1*, 763 P.2d 1255, 1262 (Wyo. 1988)) (internal quotation marks omitted). It then observed that our own circuit has recognized an exception to that legal proposition in certain circumstances—namely, in a situation wherein an insurer undertook the defense of an action without first reserving its rights. While acknowledging that the Wyoming Supreme Court had not directly spoken to this estoppel exception, the district court was persuaded that "there is no authority which suggests [that] court would reject its application." *Id.* at 1349. Given that the estoppel exception was generally available, the district court understood Wyoming jurisprudence to "suggest[]" that application of estoppel would be appropriate on these particular facts. *Id.* For the reasons explicated below, we uphold the district court's ruling.

**a**

16

The Wyoming Supreme Court has not addressed whether an insurer, having previously assumed the defense of an action without a reservation of rights, may subsequently be estopped from asserting the defense of noncoverage. This case thus presents an unsettled question of Wyoming insurance law. Consequently, we "must . . . attempt to predict how [Wyoming's] highest court would interpret [the issue]." *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 875 (10th Cir. 2013); *see Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005) ("Because Wyoming has not directly addressed this issue, this court must make an *Erie*-guess as to how the Wyoming Supreme Court would rule."). We may "consider all resources available" in doing so, "including decisions of [Wyoming] courts, other state courts and federal courts, in addition to the general weight and trend of authority." *In re Dittmar*, 618 F.3d 1199, 1204 (10th Cir. 2010) (internal quotation marks omitted).

"Under our own federal jurisprudence, we will not trouble our sister state courts every time [an unsettled legal question in a diversity action] comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007); *accord Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1236 (10th Cir. 2012). We see such a clear and principled path here.

Wyoming's general stance on estoppel in this context is traceable to 1961, when its highest tribunal observed, "Numerous cases hold that [a coverage]

17

provision cannot be waived by the agents of an insurance company and that the doctrine of estoppel *cannot be applied*." *Sowers v. Iowa Home Mut. Cas. Ins. Co.*, 359 P.2d 488, 493 (Wyo. 1961) (emphasis added). The Wyoming Supreme Court remained faithful to this principle in *Tadday v. National Aviation Underwriters*, 660 P.2d 1148 (Wyo. 1983), noting that "coverage of an insurance policy may not be extended by waiver or estoppel . . . in accord with general law," 660 P.2d at 1150 (internal quotation marks omitted), and again in *Ricci v. New Hampshire Insurance Co.*, 721 P.2d 1081 (Wyo. 1986), when it observed that "the law in Wyoming is that coverage cannot be extended by waiver or estoppel," 721 P.2d at 1086. And, in *Albany County School District No. 1*, relying on *Sowers* and its progeny, the Wyoming Supreme Court again instructed that "estoppel is not available to bring within the coverage of an insurance policy risks that are not covered by its terms or that are expressly excluded therefrom." 763 P.2d at 1261 (quoting *Sowers*, 359 P.2d at 493) (internal quotation marks omitted). From these cases, it is not difficult to discern Wyoming's *usual* rule: "the principle that the doctrines of estoppel and waiver cannot be employed to expand policy coverage is controlling." *Id.* at 1262; *accord Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1298 (Wyo. 1995).

But rules applied by courts are frequently subject to exceptions, and we conclude that the same holds true here. We have recognized and applied such an exception in *Pendleton v. Pan American Fire & Casualty Co.*, 317 F.2d 96 (10th

Cir. 1963), a diversity lawsuit involving New Mexico's substantive law. Citing, *inter alia*, a decision rendered by this court in 1930 wherein we *allowed* estoppel to expand coverage under a policy—*New Jersey Fidelity & Plate Glass Insurance Co. v. McGillis*, 42 F.2d 789, 791 (10th Cir. 1930) (applying Utah law)—we said that

> a liability insurance carrier, which assumes and conducts the defense of an action . . . with knowledge of a ground of forfeiture or noncoverage under the policy, and without disclaiming liability or giving notice of a reservation of its right to deny coverage, is thereafter precluded in an action upon the policy from setting up the ground of forfeiture or noncoverage as a defense. In other words, the insurer's unconditional defense of an action . . . constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert the defense of noncoverage. . . . [I]t is not necessary for the [defended party] to show prejudice in such a situation because he is presumed to have been prejudiced by virtue of the insurer's assumption of the defense.

317 F.2d at 99 (citations omitted).

In other words, in *Pendleton*, we concluded that the insurer was estopped from denying coverage to the ostensible insured by its conduct in unconditionally assuming the defense without a reservation of rights, and that prejudice was presumed to flow from the insurer's actions. *Id.* at 100–01 (noting that "this situation falls within the rule of estoppel" and that "the insurer is estopped to now deny liability upon the insurance policy in question"). Notably, we reached this conclusion notwithstanding our agreement with the insurer that there was not in fact coverage under the policy. *See id.* at 100 (noting that "it is clear that the

19

insurer at no time had an obligation under the questioned policy to defend" the ostensible insured). We seemed to reason that, irrespective of the actuality of noncoverage, the insurer must accept the equitable consequences of its deliberate choice to "assume[] full control of the litigation," without a reservation of rights, because the ostensible insured was "induced to, and did, relinquish control of his defense . . . to the insurer." *Id.* And those equitable consequences involved shouldering the burdens of any liability arising from the litigation that it deliberately elected to control. *See id.* at 100–01.

Nearly thirty years later, we had occasion to revisit the so-called "*Pendleton* exception" in resolving a dispute under Oklahoma law. In *Braun v. Annesley*, 936 F.2d 1105 (10th Cir. 1991), we noted that Oklahoma's highest court had not yet opined on whether it would apply an estoppel exception, of the type that we announced in *Pendleton*, to a similar set of facts. We were consequently mindful of Oklahoma's general rule that "estoppel cannot be used to create a contract." *Braun*, 936 F.2d at 1110 (citing *Sec. Ins. Co. of New Haven v. Greer*, 437 P.2d 243, 246 (Okla. 1968)). Even so, we determined that the logic employed in *Pendleton* transposed to the situation at hand:

> Tri-State defended Mr. Bradley *without* a reservation of rights. In addition, Tri-State stated at trial that it was "unclear" whether Tri-State would be liable for Mr. Bradley . . . . Thus, Tri-State acknowledged that Mr. Bradley might be covered under its policy. Given that the insurers in [*inter alia*] *Pendleton* . . . were estopped from denying coverage after providing a defense without a reservation of rights when the claimant was not even

20

arguably covered, Tri-State is also estopped when Mr. Bradley is arguably covered, and, like the circumstances in *Pendleton . . . the basis of estoppel is Tri-State's defense of Mr. Bradley without a reservation of rights.*

*Id.* at 1110–11 (citations omitted) (emphases added).

The *Pendleton* exception, we observed in *Braun*, has the potential to produce fair and correct results. We explained that it provided "a better rule" to resolve the issues presented therein—"one that encourages an insurer to thoroughly investigate its policy and notify persons *before* assuming their defense that it is reserving its right to later contest coverage." *Id.* at 1111. Likewise, we found that *not* applying the *Pendleton* exception to the particular facts before us would constitute error—that is, we "[did] not believe the Supreme Court of Oklahoma would allow an insurer to defend an individual who might be covered [without a reservation of rights] and then permit the insurer to deny coverage after the individual is found liable." *Id.* This was so, we reasoned, because "[s]uch a result [would] grant[] the insurer the unfettered right to induce an individual to relinquish control of his or her defense." *Id.* Ultimately, we were satisfied that "[t]he inequitable consequences of a contrary ruling provide[d] support for our conclusion." *Id.*

So too, here. We face substantially the same factual setting that we confronted in *Pendleton* and *Braun*: that is, the insurer's (Cornhusker's) full assumption of control of the ostensible insured's (Vincent's) defense in a lawsuit

21

seeking to impose liability on the ostensible insured (brought by the Skajs) *and* the insurer's (Cornhusker's) complete failure to provide any notice to the ostensible insured (Vincent) that it sought to reserve its right to deny him coverage. Indeed, even the attorney that Cornhusker retained to represent Vincent acknowledged these key aspects of Cornhusker's posture toward the Skajs' suit in communications with a Cornhusker representative. As he put it, "my role is to fully defend Vincent . . . since Cornhusker has agreed (properly) to fully defend him." J. App. at 1122 (Email, dated Nov. 5, 2010). Yet, he noted, while "[t]ypically, a carrier sends a reservation of rights letter which says the carrier is defending but reserves its rights . . . to determine whether coverage exists or not," neither of Cornhusker's October 2010 communications with Vincent (i.e., the October 1 and 7 letters) "can reasonably be construed as reservation of rights letters." *Id.*

To be sure, Vincent's lawyer "found it odd that Cornhusker would take this approach," given its position that Vincent was not entitled to coverage. *Id.* But *Pendleton* and *Braun* make clear that this is not the first time that insurers have followed such a path. And these cases also indicate that insurers should bear a specific consequence of such conduct: *viz.*, they should be estopped from later denying coverage to an ostensible insured to escape liability stemming from litigation over which they deliberately assumed control without a reservation of rights. Given their factual similarity to the instant case, we believe that

22

*Pendleton* and *Braun* counsel in favor of applying estoppel to prevent Cornhusker from disputing coverage.

Furthermore, our study of relevant decisions of "other . . . federal courts" strongly suggests that "the general weight and trend of authority," *Dittmar*, 618 F.3d at 1204 (internal quotation marks omitted), is to recognize an exception such as the one we articulated in *Pendleton*. *See, e.g.*, *City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1060–62 (8th Cir. 1979); *Pac. Indem. Co. v. Acel Delivery Serv., Inc.*, 485 F.2d 1169, 1173 (5th Cir. 1973); *Peerless Ins. Co. v. Travelers Ins. Co.*, 393 F.2d 636, 639–40 (9th Cir. 1968); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Sur. Co.*, 384 F.2d 316, 366 (D.C. Cir. 1967); *Claverie v. Am. Cas. Co. of Reading*, 76 F.2d 570, 571–72 (4th Cir. 1935).

Based on federal authorities, then—most notably our own—we would be inclined to predict that the Wyoming Supreme Court would adopt an estoppel doctrine like *Pendleton* on these facts. Our examination of germane Wyoming caselaw confirms our inclination and leads us to definitively predict that the Wyoming Supreme Court would apply a *Pendleton*-type estoppel exception here.

**b**

Fairness undergirds Wyoming's general approach to estoppel.[8] *See Birt v.*

---

[8] We express no view in this opinion as to whether the Wyoming Supreme Court would rely upon promissory estoppel or equitable estoppel on these facts. "The doctrines . . . are closely related and, as [the Wyoming Supreme Court has] impliedly recognized . . . , they often have been invoked together and interchangeably

(continued...)

23

*Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 654 (Wyo. 2003) (stating that estoppel "is to be applied to . . . promote the end of justice, where it would be inequitable not to do so"); *B & W Glass, Inc. v. Weather Shield Mfg., Inc.*, 829 P.2d 809, 817 (Wyo. 1992) (recognizing that "the principle of fairness [is] implicit in recognizing the doctrine of . . . estoppel"). The Wyoming Supreme Court has delineated estoppel as a remedy that "flows from the actual consequences produced by the conduct of A on B regardless of whether A intended those consequences or not," and the court has clarified that "[t]he [insurer] is estopped when the [individual] is deceived; the deception occurs when the [individual] is lulled into a false sense of security." *Bauer v. State ex rel. Wyo. Worker's Comp. Div.*, 695 P.2d 1048, 1051 (Wyo. 1985); *accord Parkhurst v. Boykin*, 94 P.3d 450, 460–61 (Wyo. 2004).

Wyoming's general estoppel principles support our conclusion that a *Pendleton*-type estoppel exception should be applied to Cornhusker on these facts. Cornhusker's conduct had the effect of lulling Vincent into the belief that Cornhusker was representing him pursuant to the Policy. Cornhusker specifically retained counsel to represent him in state court and subsequently rendered a defense. During that time period, when Cornhusker had a plausible basis for reserving its rights (due, *inter alia*, to the dispute concerning whether Vincent

---

[8](...continued)
. . . . Reasonable reliance is an element common to both of these doctrines." *Davis v. Davis*, 855 P.2d 342, 348 (Wyo. 1993) (citations omitted).

24

was a "permissive user" under the Policy), it never took that critical step.

In particular, prior to the court's imposition of liability on Vincent, Cornhusker did not "make specific reference to the policy defense[,] which the insurer [i.e., Cornhusker] [could] assert," in any communication with him—which was a necessary predicate under Wyoming law for a finding that Cornhusker had reserved its rights. *Doctors' Co. v. Ins. Corp. of Am.*, 864 P.2d 1018, 1030 (Wyo. 1993). Based upon Cornhusker's silence in that regard, Vincent effectively ceded control of his defense to Cornhusker. And he cannot be viewed as unreasonable for doing so. Yet, later, upon entry of judgment, Cornhusker elected not to provide coverage. We cannot ignore the possibility (even if arguably remote) that, under these circumstances, Vincent "[had] a valid claim [which was] lost because of some action by . . . the insurance provider . . . reasonably relied upon by [him] to [his] detriment." *Picozzi v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 304 P.3d 977, 981 (Wyo. 2013) (internal quotation marks omitted); *accord Bauer*, 695 P.2d at 1052. This sort of unfairness, we predict, would be of significant concern to the Wyoming Supreme Court when considering the possible application of a *Pendleton*-type estoppel to Cornhusker. *See Bauer*, 695 P.2d at 1052 (concluding that analogous unfairness signaled that "relief should be granted" in the form of estoppel).

Further, in assaying the relevant Wyoming caselaw, we find unavailing Cornhusker's contention that "[t]he Wyoming Supreme Court *has rejected* the

25

estoppel theory advanced" here, Cornhusker Opening Br. at 25 (emphasis added),

in *Albany County School District No. 1.* No doubt Cornhusker hopes we will

seize upon language in that case discussing the baseline rule that "coverage

afforded by [a] policy cannot be expanded by estoppel."[9] *Albany Cnty. Sch. Dist.*

*No. 1*, 763 P.2d at 1262. However, we regard *Albany County School District No.*

*1* as readily distinguishable. That case concerned an insurance policy that

required the insurer to indemnify a county school district for any judgment

entered against the "insureds," a term which was defined *not* to include the school

district itself. *See id.* at 1259. To be sure, Cornhusker is arguably correct that

"[t]here, as here, the party claiming coverage was not an 'insured' as defined by

the policy." Cornhusker Opening Br. at 27. But Cornhusker misstates *Albany*

*County School District No. 1* as "parallel[ing] the theory of estoppel," *id.*,

advanced here in one vital respect: the existence of a reservation of rights.

---

9      After oral argument, by way of a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Cornhusker notified this court of a recent Wyoming decision—*Lewis Holding Co. v. Forsberg Engerman Co.*, 318 P.3d 822 (Wyo. 2014)—which it considers dispositive as to the estoppel issue presented. We disagree. *Lewis Holding Co.* relates only tangentially to these proceedings insofar as it sets forth the general state-law rule that estoppel cannot expand or create insurance coverage. *See* 318 P.3d at 825–26. In that regard, *Lewis Holding Co.* adds nothing new to the relevant body of Wyoming law. And, in any event, the case is distinguishable because the fact that "the insurance agreement between [the parties] plainly and *unambiguously exclude[d] coverage* for damages," *id.* at 826 (emphasis added), persuaded the court to apply the default rule that "estoppel cannot be used to extend the insurance coverage to include risks that are expressly excluded by the policy," *id.* We arguably have no such clarity here as to the exclusion *vel non* of Vincent from the ambit of the Policy. For these reasons, we ultimately do not view Cornhusker's notice of supplemental authority as particularly helpful to our resolution of this question.

Notably, after an Albany County employee sued the school district, the insurer "agreed to defend the suit *while retaining its full reservation of rights with respect to coverage.*" *Albany Cnty. Sch. Dist. No. 1*, 763 P.2d at 1256 (emphasis added) (internal quotation marks omitted). Judgment was entered against the school district, at which time the insurer denied coverage to the district and withdrew its defense of the action. The trial court ruled that the insurer was estopped from denying coverage, but the Wyoming Supreme Court reversed.

In so doing, the court held that Wyoming's basic rule—i.e., that estoppel cannot expand or create coverage where none exists—applied with equal force under those circumstances because

> [i]n a letter to the School District dated March 8, 1985, St. Paul [, i.e., the insurer,] advised that it *conditionally* agreed to provide a defense for the School District in the underlying case. *In this letter St. Paul also stated: "Furthermore we have advised you that The St. Paul is reserving all its rights as to the issues of coverage . . . under the terms and conditions of your policy."* St. Paul, in this letter, further advised the School District of several possible grounds upon which it might deny coverage . . . .

*Id.* at 1262 (emphases added). That reservation-of-rights letter, the court reasoned, placed the school district on notice that it might not be covered under the policy notwithstanding the insurer's assumption of its defense. *See id.* ("St. Paul's agreement to accept the defense of the case with 'a full reservation of rights' negates any intent to waive any objection to coverage."). Thus, we

27

conclude with no difficulty that the insurer's conduct in *Albany County School District No. 1*—which counseled *against* invoking estoppel—stands in stark relief to Cornhusker's conduct here, which we have concluded strongly militates in favor of applying estoppel.

In sum, our review of relevant Wyoming authorities strongly confirms, and establishes the soundness of, the provisional judgment that we formed from examining our own precedent (as well as other federal caselaw)—*viz.*, under facts such as these, we predict that the Wyoming Supreme Court would apply a *Pendleton*-type estoppel exception to preclude Cornhusker from asserting Vincent's alleged lack of coverage under the Policy. Consequently, we hold that the district court was correct in its invocation of the *Pendleton* exception to estop Cornhusker here. Like the district court, we believe that the facts before us present a "compelling" justification for using such an exception, J. App. at 1351, and we predict that the Wyoming Supreme Court would agree. Consequently, we uphold this aspect of the district court's judgment.

## B

We turn next to Vincent's contention that the district court incorrectly dismissed his bad-faith claim and denied him punitive damages. We conclude that the district court did not err in either respect.

## 1

Vincent describes his bad-faith claim against Cornhusker as "truly simple"

28

in that it is "based upon Cornhusker's first promising [him] a defense, then retaining counsel on his behalf to secure an extension to answer, and then obviously directing that counsel not to answer and allowing a default to be entered—all without warning [Vincent] of its decision to do so."  Rosty Br. at 13–14 (citations omitted).  Implicit in this recitation of the claim, in our view, is the invitation to infer bad faith on the part of Cornhusker.  Insofar as Vincent's argument can be read thusly, we do not find a significant basis for such an inference.  Our determination in Part III.A, *supra*—that Cornhusker is estopped from denying coverage to Vincent—does *not* ineluctably lead to a finding of bad faith by Cornhusker.  Entirely different standards govern the latter type of claim—ones Vincent has not met.

Wyoming recognizes both substantive and procedural bad faith in the insurance context.  *See Sonnett v. First Am. Title Ins. Co.*, 309 P.3d 799, 806–07 (Wyo. 2013) (stating that an insurer acts in bad faith where the substantive validity of a denied claim is "not fairly debatable," and also "by the manner in which it investigates, handles, or denies a claim" (internal quotation marks omitted)); *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1099 (Wyo. 1992) ("*Hatch I*") (observing that a defense to substantive bad-faith liability, which depends on an insurer having "[a] 'fairly debatable' reason to deny a claim," is "not a defense" to procedural bad-faith liability, which "may flow from engaging in oppressive and intimidating claim practices"); *see also Marathon*

29

*Ashland Pipe Line LLC v. Md. Cas. Co.*, 243 F.3d 1232, 1246 (10th Cir. 2001) (acknowledging that Wyoming law recognizes both varieties of bad faith). In Vincent's estimation, Cornhusker committed both species of bad faith by denying him coverage under the Policy. We disagree.

**a**

First, with respect to whether Cornhusker's denial of coverage amounted to substantive bad faith, we note Wyoming's longstanding focus on "whether or not the validity of the denied claim was fairly debatable." *Darlow v. Farmers Ins. Exch.*, 822 P.2d 820, 823 (Wyo. 1991); *accord First Wyo. Bank, N.A., Jackson Hole v. Cont'l Ins. Co.*, 860 P.2d 1094, 1101 (Wyo. 1993). "The validity of a claim is fairly debatable if a reasonable insurer would have denied or delayed payment of benefits under the facts and circumstances." *Harper v. Fidelity & Guar. Life Ins. Co.*, 234 P.3d 1211, 1221 (Wyo. 2010) (internal quotation marks omitted). Applying this objective standard requires us to determine if Vincent has established "(1) the absence of any reasonable basis for denying the claim and (2) [Cornhusker's] knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 950–51 (Wyo. 1998); *accord Gainsco Ins. Co. v. Amoco Prod. Co.*, 53 P.3d 1051, 1058 (Wyo. 2002). In our view, Vincent has failed to make such a showing.

Vincent's substantive bad-faith claim founders on the first prong of Wyoming's test: the absence of *any* reasonable basis for denying his claim. To

30

satisfy this component of the standard, a litigant "must show that a reasonable insurer under the circumstances would not have acted as it did by denying . . . the claim." *Sonnett*, 309 P.3d at 806 (quoting *Matlack v. Mountain W. Farm Bureau Mut. Ins. Co.*, 44 P.3d 73, 81 (Wyo. 2002)) (internal quotation marks omitted). Wyoming caselaw makes clear that an insurer enjoys a wide berth in this regard—*viz.*, "if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a [bad-faith] claim." *Gainsco Ins. Co.*, 53 P.3d at 1062 (quoting *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 860 (Wyo. 1990)) (internal quotation marks omitted). Moreover, the Wyoming Supreme Court has clarified that the realistic-question aspect of the "fairly debatable" standard "is not the same as asking whether there actually was coverage under the policy." *Id.* at 1063. This means that, under Wyoming law, "it is not necessarily an act of bad faith for an insurer to deny . . . payment of benefits where the underlying incident objectively may be seen as being covered by a policy exclusion, particularly where there is no controlling authority within the jurisdiction." *Id.*

While the district court resolved the substantive bad-faith issue without much explication, its decision comports with Wyoming's standards. The court identified two potentially reasonable bases supporting Cornhusker's denial of coverage: (1) the uncertainty as to whether the Wyoming Supreme Court would employ an estoppel doctrine, like the one established in *Pendleton*, to broaden the

31

Policy's coverage, and (2) Vincent's status under the Policy (i.e., whether he was a "permissive user" of R&R's dump truck). Both of these grounds for denial are eminently reasonable.

The first—which we have thoroughly discussed above—presents a significant potential for disagreement regarding the propriety of an insurer's denial of coverage. As to the second, record evidence suggests that Cornhusker had a reasonable basis to conclude that Vincent was not a permissive user. Although Vincent certainly had permission to operate R&R's vehicles in the course and scope of his employment, R&R did maintain at least an unofficial policy discouraging personal use of company vehicles. Indeed, Vincent acknowledged that he "didn't really have R&R's permission" to use its vehicles for personal use, J. App. at 707, and R&R did not direct him to travel to the Skajs' home on the date of the accident. It is true that Vincent also indicated that he had driven to the Skajs' residence in R&R's vehicles on numerous occasions, that "[t]he whole crew knew [he] went there," and that Steven and Randy had "seen" him do so but never reprimanded him. *Id*. at 709–10. But we cannot definitively conclude, based on this conflicting testimony, that Vincent had permission to use the truck for personal reasons—and as long as the extent of his permissive use remained "fairly debatable," Cornhusker's decision to deny him coverage on that basis was reasonable.

In sum, we are satisfied that the district court properly identified a

32

reasonable basis for Cornhusker's denial of coverage as to Vincent. It naturally follows that the district court's determination that Cornhusker had a fairly debatable justification for denying coverage was sound. We thus conclude that Cornhusker did not act in substantive bad faith in its dealings with Vincent, and we affirm that aspect of the court's ruling.

**b**

Turning next to the issue of procedural bad faith, we note that "[e]ven if a claim for benefits is fairly debatable, the insurer may breach the duty of good faith and fair dealing by the manner in which it investigates, handles, or denies a claim." *Matlack*, 44 P.3d at 81; *accord Sonnett*, 309 P.3d at 807. Under Wyoming law, it is "appropriate [in this procedural inquiry] to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." *Hatch I*, 842 P.2d at 1093. A party may argue that "*failure to investigate* or evaluate a claim" supports a finding of procedural bad faith. *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 828 (Wyo. 1994) (emphasis added).

In applying this failure-to-investigate rubric, the Wyoming Supreme Court has required a "compelling" factual showing and has declined to find even a "cursory examination of the case" or a "delay . . . showing [the insurer] drug its heels" sufficient to establish procedural bad faith. *Matlack*, 44 P.3d at 81. Stated otherwise, unless it is evident that the insurer performed *no* form of satisfactory

33

investigation, a procedural bad-faith claim will not be viable. *See Sonnett*, 309

P.3d at 807 (rejecting a procedural bad-faith claim when the record

unambiguously demonstrated at least a passable investigation).

The Wyoming Supreme Court's decision in *Hatch I* is instructive. It

powerfully demonstrates the egregious level of misconduct that typically gives

rise to liability for procedural bad faith—a level of insurer misconduct that is not

even arguably present here. Put another way, *Hatch I* unequivocally shows the

high hurdle that must be surmounted to succeed on this ground. In that case, the

Wyoming Supreme Court found a sufficient factual basis for procedural bad faith

concerning the investigation of a house-fire claim. The court found that the

insurer's handling of the claim—notwithstanding its suspicion of arson—was

beyond the pale: notably, the insureds were required to file a 275-page inventory

of household items and "were told that they must list how many cornflakes were

left in the cereal box before the fire, and how much salt was in the salt shaker."

*Hatch I*, 842 P.2d at 1098. Apparently these requirements were only the tip of the

proverbial iceberg of the insurer's egregious conduct:

> Appellants were threatened by State Farm
> representatives . . . . Appellants were required to make
> unreasonable reports, statements and inventories, even after State
> Farm had decided to reject their claim.
>
> State Farm took over the Hatch house, ousted the Hatch family
> from possession, and searched the house from top to bottom.
> State Farm conducted several unsupervised searches of the home
> and . . . would not allow appellants to have free access to their

34

> house for eight days after the fire . . . . [The] Hatches were given an unrealistic deadline in which to file this inventory. A team of five State Farm representatives interviewed Mrs. Hatch four different times. One interview lasted five hours with no break for lunch. Mrs. Hatch characterized the State Farm representatives as rude, abrupt, sarcastic, unprofessional, and hostile. Additionally, the sworn statements of the [Hatches'] twin boys, ten years old, were taken.

*Id.* The insurer also hid exculpatory information from the prosecutor in the related arson case, demanded mental-health records for one of the insureds' children, and contacted the insureds' creditors. *Id.*

We would be hard-pressed to find Cornhusker's conduct even remotely comparable to that of the insurer in *Hatch I.* As the district court observed, Cornhusker "immediately investigated the accident," defended Vincent when his whereabouts were unknown, and "ma[de] an attempt to locate [him] at his mother's house" before ultimately denying coverage. J. App. at 1354–55. Cornhusker's handling of the claim was certainly not perfect; for instance, we do not gainsay that heeding Mr. Brando's suggestions for contacting Vincent could have benefitted all parties involved during the course of the Skajs' lawsuit. However, even under the most charitable framing (i.e., in the light most favorable to Vincent), the evidence merely demonstrates that Cornhusker could have intensified its efforts to locate Vincent during the pendency of the state-court proceedings and failed to make a timely reservation of rights. Based upon our assessment of Wyoming law, this conduct does not constitute "oppressive" or

35

"unreasonable" claims practices, or ones undertaken "to gain an unfair advantage" over Vincent. *Hatch I*, 842 P.2d at 1099; *see also Ahrenholtz*, 968 P.2d at 951 (rejecting a bad-faith claim where, unlike in *Hatch I*, there was no record evidence that the insurer "deliberately misrepresented policy provisions," "made oppressive demands," or "retaliated against the insureds in any way").

In the end, we find factually dubious Vincent's contention that Cornhusker "[sat] quietly . . . , and after acting *as unfairly as it pleased* through the claims process, . . . rais[ed] coverage questions for the first time in a motion for summary judgment." Rosty Br. at 19 (emphasis added). To be sure, there were fairness concerns implicated by Cornhusker's arguably flawed handling of the claim, but (as Wyoming law instructs) bad-faith liability was not the means to redress them. In this regard, we have upheld *supra* the district court's application here of estoppel principles to Cornhusker, which was triggered by Cornhusker's handling of the claim; that approach (as opposed to one predicated on a dubious finding of procedural bad faith) was suitable and proper. Thus, on this record, without more, we do not find that Cornhusker engaged in procedural bad faith. We consequently reject Vincent's bad-faith claim in full.

**2**

Because Vincent's claim for punitive damages is predicated upon a finding

36

of bad faith, it is also unavailing.[10]  "Punitive damages should not be awarded

for . . . mere thoughtlessness or inadventure, or simple inattention."  *Shrader*, 882

P.2d at 837 (quoting *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo. 1979))

(internal quotation marks omitted).  On the contrary, such damages "are to be

awarded only for conduct involving some element of outrage similar to that

usually found in a crime."  *Hatch v. Walton*, 343 P.3d 390, 399 (Wyo. 2015);

*accord Alexander v. Meduna*, 47 P.3d 206, 218 (Wyo. 2002).

Vincent limits his appellate argument for punitive damages to a handful of

unsubstantiated and conclusory assertions: notably, that Cornhusker's behavior

(1) was "the very essence of the type of conduct exemplary damages must

address"; (2) involved "willful actions"; and (3) placed him in "manifest" danger.

Rosty Br. at 23.  Statements of this kind make clear that Vincent has "failed to

contest in any meaningful way the district court's dismissal of" his claim for

punitive damages.  *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 915 (10th

Cir. 2012).  In any event, as we alluded to *supra*, we have thoroughly reviewed

the record and see no evidence of conduct by Cornhusker that would warrant an

---

[10]    Even assuming *arguendo* that Cornhusker *had* acted with bad faith as to
Vincent, we would not be compelled to reverse the district court's denial of punitive
damages.  The Wyoming Supreme Court has underscored this point by noting, "We do
not conclude . . . that the proof of a bad faith cause of action necessarily makes punitive
damages appropriate. . . .  For punitive damages to be awarded in addition to
compensatory damages for the tort, there must be a showing of an evil intent . . . ."
*McCullough*, 789 P.2d at 861 (second omission in original) (internal quotation marks
omitted); *see also id.* (noting that an award of punitive damages "require[s] wanton or
willful misconduct").

award (under the operative legal standards) of punitive damages. Put another way, we are satisfied that the district court soundly applied Wyoming's punitive-damages standard when it concluded that Cornhusker cannot be said to "have been guilty of oppression, fraud or malice." *Farmers Ins. Exch. v. Shirley*, 958 P.2d 1040, 1051 (Wyo. 1998) (internal quotation marks omitted); *see Hatch v. State Farm Fire & Cas. Co.*, 930 P.2d 382, 397 (Wyo. 1997) ("*Hatch II*") (affirming the district court's denial of punitive damages after determining that "the conduct by State Farm did not reach the requisite heights to be described as outrageous, extreme, atrocious, utterly intolerable, nor beyond all possible bounds of decency"); *see also* J. App. at 1358 (characterizing Cornhusker's behavior as "fall[ing] well short of the conduct" described in *Hatch II*). As a result, we uphold the district court's ruling on Vincent's punitive-damages claim.

## C

Finally, we address the Skajs' contention that the district court incorrectly granted summary judgment to Cornhusker on the issue of attorneys' fees. The Skajs contest the substantive and procedural aspects of the court's decision. Finding no error in either regard, we uphold the district court's summary-judgment ruling on this point.

## 1

As part of their counterclaim, the Skajs sought to recover attorneys' fees pursuant to Wyoming's insurance code. The relevant statute provides:

38

> In any actions or proceedings commenced against any insurance company on any insurance policy or certificate of any type or kind of insurance, or in any case where an insurer is obligated by a liability insurance policy to defend any suit or claim or pay any judgment on behalf of a named insured, if it is determined that the company refuses to pay the full amount of a loss covered by the policy and that *the refusal is unreasonable or without cause*, any court in which judgment is rendered for a claimant may also award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year.

Wyo. Stat. Ann. § 26-15-124(c) (emphasis added). Third-party (i.e., non-insured) claimants (such as the Skajs) generally receive compensation under § 26-15-124(c) "under limited circumstances." *Shrader*, 882 P.2d at 835.

The Wyoming Supreme Court has explained that "[t]he purpose of this statute . . . is to encourage the prompt settlement of justifiable claims by providing redress for an insurer's wrongful refusal to pay." *Herrig v. Herrig*, 844 P.2d 487, 495 (Wyo. 1992); *see also Stewart Title Guar. Co. v. Tilden*, 181 P.3d 94, 103 (Wyo. 2008) ("*Tilden II*") (indicating that the purpose of the statute is to "protect an insured who has suffered a loss from annoying and expensive litigation" (internal quotation marks omitted)). More recently, the Wyoming Supreme Court has clarified that a claim brought under § 26-15-124(c) requires proof, *inter alia*, "that in [an] action or proceeding it was determined that the [insurer] refused to pay the full amount of loss covered by the policy . . . and that a determination was made in that action or proceeding that the refusal was unreasonable or without cause." *Stewart Title Guar. Co. v. Tilden*, 110 P.3d 865,

39

873 (Wyo. 2005) ("*Tilden I*").

As relevant here, the district court determined that the Skajs' situation did not fall within the universe of "limited circumstances" warranting an award of attorneys' fees. The district court reasoned that the "unreasonable or without cause standard" was materially identical to the standard utilized in Wyoming for bad-faith insurance claims. Thus, by way of overview, the court grounded its denial of attorneys' fees here on its conclusions that (1) Cornhusker's denial of coverage was reasonable and fairly debatable, and (2) Cornhusker's conduct did not rise to the level of bad faith. For the reasons explicated below, we discern no error in this reasoning.

**2**

One procedural issue must be addressed before we reach the merits of the district court's determination—namely, the Skajs' insistence that they possess evidence that they need to put before us on appeal that raises a genuine issue of material fact on the attorneys'-fees issue. They have sought leave to file a supplemental appendix, the contents of which they have described as "legitimate discovery materials that would have been presented if the rules of procedure had been followed" in the district court. Mot. for Leave to File Supp. App., No. 13-8004, at 5 (10th Cir., filed Apr. 26, 2013).[11] In other words, they seek to put

---

[11] The Skajs represented in their motion that the materials to be included were (1) depositions of three Cornhusker employees and associated exhibits; (2) a letter

(continued...)

before us materials that were not submitted to the district court for its consideration in ruling on the summary-judgment motions. Our clerk's office provisionally granted this motion, pending the merits panel's (i.e., our) final determination.

We undoubtedly have discretion to deny a motion to supplement the record on appeal when the materials sought to be added to the record were never before the district court. *See, e.g.*, *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1176 (10th Cir. 2013) ("We DENY Plaintiffs' amended motion to file a supplemental appendix as the material was not before the district court."); *United States v. Kennedy*, 225 F.3d 1187, 1191, 1193 (10th Cir. 2000) (holding, as to materials "not a part of the record before the district court," that "the circumstances in the present case do not lead us to believe the interests of justice would best be served by exercising our inherent equitable power to allow Mr. Kennedy to supplement the record on appeal"); *see also Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1475 n.4 (10th Cir. 1993) (collecting cases). And we in fact exercise that discretion to deny the Skajs' motion. Furthermore, because we deny the Skajs' motion, we also deny as moot Cornhusker's pending motion to seal the Skajs' proposed supplemental appendix.

---

[11](...continued)
informing the district court "that Cornhusker had not moved for summary judgment on the [attorneys'-fees] claim"; and (3) a Wyoming Supreme Court opinion of which the district court actually took judicial notice. Mot. for Leave to File Supp. App. at 4 n.1.

41

More specifically, we reach our conclusion regarding the Skajs' motion because the procedural history of this case demonstrates that the Skajs could have presented the contents of their proposed supplemental appendix to the district court, but neglected to do so. Consequently, given the Skajs' failure to introduce those documents, the supplemental appendix containing them should not be added to the record on appeal in this eleventh hour. In this regard, on November 29, 2012, the district court held a hearing on the parties' cross-motions for summary judgment. Neither Cornhusker nor the Skajs had argued the issue of attorneys' fees in their summary-judgment briefing, and apparently they were similarly silent on the issue at the hearing before the district court. At the end of the motions hearing, the district court orally granted summary judgment to the Skajs on the estoppel issue and to Cornhusker on Vincent's various claims. The court announced its intent to issue a written ruling by Christmas and stated that no trial would be necessary. The very next day, the Skajs filed a notice with the district court requesting that the trial remain on the court's calendar so that they could litigate the attorneys'-fees issue.

Cornhusker responded on December 4, 2012, contending that the Skajs had failed to present evidence in support of their claim for attorneys' fees. Moreover, Cornhusker noted that the Skajs' purported statutory basis for attorneys' fees required any award to be based on a finding of unreasonable conduct or conduct that is without cause. *See* Wyo. Stat. Ann. § 26-15-124(c). According to

42

Cornhusker, the district court's determination that Cornhusker had not acted in bad faith precluded such a finding and obviated the need to consider the fees matter further.

On December 5, 2012, the district court entered a text-only minute order stating that "the granting of Cornhusker's motion for summary judgment with respect to Vincent['s] claim for bad faith [was] likewise dispositive of the Skajs' claim for attorneys' fees" and that all legal issues would be resolved by the court's forthcoming written ruling. Dist. Ct. Doc. 188 (Min. Entry, dated Dec. 5, 2012). The district court's docket contains no entries with filing dates between this minute order and the district court's summary-judgment order, which issued on December 11, 2012. In other words, as particularly germane here, the docket indicates that the Skajs did not file *anything* before the written summary-judgment decision—much less a formal objection to the district court's minute-order resolution of their attorneys' fees claim.

In our view, the foregoing procedural history eviscerates the Skajs' argument for why they should be allowed to supplement the record—namely, that "[t]he district court *prevented* [them] from presenting any evidence on their claim for attorneys' fees." Skajs' Br. at 36 (emphasis added). We find it beyond peradventure that the Skajs did not avail themselves of the opportunity to request this relief (which could have been explicitly conditioned on their merits success) before December 5, 2012, when the district court entered the minute order

43

signaling the impending end of its involvement in the summary-judgment proceedings. Moreover, after that date, the onus rested squarely on the Skajs to object to the contents of the court's minute order and preserve their rights to develop facts concerning the attorneys'-fees claim. Our caselaw unmistakably holds that a party's failure to timely challenge "purported errors—be they instructional or otherwise—ordinarily [means] he cannot 'prevail unless he could successfully run the gauntlet created by our rigorous plain-error standard of review.'" *United States v. Banks*, 761 F.3d 1163, 1185 (10th Cir.) (quoting *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012)), *cert. denied*, --- U.S. ----, 135 S. Ct. 308 (2014); *see United States v. Wardell*, 591 F.3d 1279, 1309–10 (10th Cir. 2009) (explaining that "[a] forfeiture implicating plain error review" occurs when a litigant "fail[s] to make the timely assertion of a right" (second alteration in original) (emphasis omitted) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) (internal quotation marks omitted)).

Simply put, our general rule is that "a litigant must lodge an objection to a purported error while the district court still has an opportunity to fix it." *Banks*, 761 F.3d at 1186; *see also Wardell*, 591 F.3d at 1310 (deeming it "too late" when a litigant's objection "was not made known at the time that the court [wa]s making its decision to act" (alteration in original) (internal quotation marks omitted)); *United States v. Walsh*, 75 F.3d 1, 6 (1st Cir. 1996) ("[T]he usual rule is that an objection must be made known at the time that the court is making its

44

decision to act. . . .").  The Skajs did not lodge an objection to the district court's minute-order resolution of their attorneys' fees claim, which likely would have given the district court an opportunity to consider their purported need for additional evidence and to conceivably shift course.  Accordingly, the Skajs forfeited the claim that they were prevented from presenting evidence.  And, on appeal, they do not argue for our review of this forfeited claim under the plain-error standard; ordinarily, this "surely marks the end of the road" for such claims.  *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).  Indeed, we would be hard-pressed to find a good reason to permit them to file their proposed appendix now.

To be sure, we have occasionally examined (in an abundance of caution) whether the evidence of a party—heading toward defeat—would have created a genuine issue of material fact.  *See, e.g.*, *Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1068 (10th Cir. 2007) ("Having reviewed the deposition excerpts [that were not presented to the district court] ourselves . . . even if plaintiff's counsel had tendered these deposition excerpts to the trial court they would not have provided evidence of any specific harassing act during the filing period.").  However, we are not obliged to do so.  We do not believe this would be the prudent and appropriate course here, especially in view of the Skajs' patent failure to seize the opportunities available to them to put their evidence before the district court.

45

**3**

Thus, considering the same record as the district court, we conclude that the court did not err in finding in Cornhusker's favor regarding the Skajs' claim for attorneys' fees. It is well-settled Wyoming law that "[t]he policy behind [the attorneys'-fees] statute is not to penalize insurance companies," but, rather, to "chill any tendencies upon the part of insurance companies to unreasonably reject claims." *State Sur. Co. v. Lamb Constr. Co.*, 625 P.2d 184, 188 (Wyo. 1981); *accord Tilden II*, 181 P.3d at 103; *Herrig*, 844 P.2d at 495. And, according to the Wyoming Supreme Court, establishing one's entitlement to statutory attorneys' fees "*requires*" proving that "a determination was made in [the relevant] action or proceeding that the [insurer's] refusal was unreasonable or without cause." *Tilden I*, 110 P.3d at 873 (emphasis added); *accord Principal Life Ins. Co. v. Summit Well Serv., Inc.*, 57 P.3d 1257, 1265 (Wyo. 2002). Indeed, the court has explained that "[a]n element of the claim is that a finding of unreasonableness was made in a prior proceeding or action (if not, then in the current action)." *Tilden I*, 110 P.3d at 873. No such finding has been made here, and we decline to make this finding sua sponte.

Moreover, though we do not expressly hold that one claim necessarily resolves the other, we believe the district court properly looked to the bad-faith standard for guidance in addressing the Skajs' attorneys'-fees claim. This approach is appropriate, given Wyoming's position that its attorneys'-fees

46

"statute complements and enforces the duty of good faith and fair dealing that an insurer owes to its insured." *Herrig*, 844 P.2d at 495. Cornhusker had a reasonable basis for its chosen course of conduct in these proceedings. Having so concluded, we will not reverse course here and find that the Skajs are nonetheless entitled to attorneys' fees based on unreasonableness. We instead adhere to our usual view that "awards of attorney fees . . . under Wyoming case and statutory law are matters directed to the court's discretion." *Bruegger v. Nat'l Old Line Ins. Co.*, 529 F.2d 869, 870 (10th Cir. 1976) (per curiam); *accord Smith v. Equitable Life Assurance Soc'y*, 614 F.2d 720, 724 (10th Cir. 1980). That discretion was rightly exercised here.

Accordingly, we uphold the district court's denial of attorneys' fees to the Skajs based upon its antecedent determinations that Cornhusker (1) had a reasonable basis for denying coverage, and (2) committed no bad faith.

## IV

For the reasons stated herein, we **AFFIRM** the decision of the district court in full, **DENY** the Skajs' motion to file a supplemental appendix, and **DENY AS MOOT** Cornhusker's motion to seal the proposed supplemental appendix.

47