# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 106

### APRIL TERM, A.D. 2013

### September 13, 2013

GEORGE M. SONNETT, JR. and
WENDY Z. BURGERS SONNETT,
Husband and Wife,

Appellants
(Plaintiffs),

v.

FIRST AMERICAN TITLE
INSURANCE COMPANY, a California
corporation, and FIRST AMERICAN
TITLE INSURANCE COMPANY OF
SUBLETTE COUNTY, a Wyoming
corporation,

Appellees
(Defendants).

S-12-0237

*Appeal from the District Court of Sublette County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellants:*
George M. Sonnett, Jr. and Wendy Z. Burgers Sonnett of Washington, Virginia, *pro se*. Argument by Mr. Sonnett and Ms. Burgers Sonnett.

*Representing Appellees:*
Stuart R. Day and Keith J. Dodson of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Day.

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**VOIGT, Justice.**

[¶1]    The appellants, George M. Sonnett, Jr. and Wendy Z. Burgers Sonnett, filed a complaint against the appellees, First American Title Insurance Company and First American Title Insurance Company of Sublette County (collectively "First American"). In their complaint, the Sonnetts alleged that First American breached the terms of the title insurance policy, was negligent, and acted in bad faith when it determined that damages the Sonnetts claimed they incurred due to a "Master Plan" associated with their property was not covered under the title insurance policy.  After the parties filed competing motions for summary judgment, the district court granted summary judgment in favor of First American and dismissed the Sonnetts' complaint.  The Sonnetts now appeal that decision and other procedural matters.

## ISSUES

[¶2]    1.    Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' breach of contract claim?

2.    Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' bad faith denial of coverage claim?

3.    Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' claims of negligence?

4.    Did the district court abuse its discretion when it considered a decision letter it previously issued in a different civil action involving the Sonnetts and the same property at dispute in the present case?

5.    Did the district court abuse its discretion when it struck portions of the Sonnetts' affidavits that were attached to their motion for summary judgment?

6.    Did the district court err when it granted First American's motion for summary judgment despite the fact that it had already ordered the parties to mediate the case?

## FACTS

[¶3]    This Court previously discussed in depth the facts surrounding the property that was purchased by the Sonnetts:

> Harold and Leda Reach owned a substantial tract of property in Sublette County, Wyoming.  In 1989, they applied to the county to change the zoning on a twenty-acre parcel of

1

that property from Agricultural to Recreational, with the stated purpose of developing a lodge for resort use. In order to gain approval of the application during the hearing process, the Reaches offered a set of restrictive covenants entitled the "Proposed Masterplan of Elk Ridge Lodge Development." This proposed Master Plan restricted the use and development of the property more than the standard limitations placed on property with Recreational Zoning. The County accepted the Master Plan and approved the zoning change application. The Master Plan and the County's resolution approving the zoning change were recorded with the County Clerk in Sublette County's property records.

The Reaches later sold the twenty-acre parcel to Elk Ridge Lodge, Inc., a corporation owned by their son, Terry Reach, and another person, Daniel Fox. In the fall of 1989, Elk Ridge began operating a resort facility on the property, offering lodging, a restaurant with a beer liquor license, gasoline sales, outfitting, and a gift shop. Over the next several years, Elk Ridge made several improvements to the property, and continued operating the resort lodge.

In the [s]pring of 2001, Elk Ridge entered into a contract to sell the property to the Sonnetts. Prior to closing, the Sonnetts obtained title insurance [from First American]. The policy listed a number of easements and other restrictions on the property, but did not mention the Master Plan. The Sonnetts contend that they were unaware of the existence of the Master Plan. The Sonnetts further contend that Elk Ridge had been operating the resort lodge for several years in a manner consistent with its Recreational Zoning, but contrary to some of the restrictions contained in the Master Plan.

The Sonnetts learned of the Master Plan in 2006. In May of that year, they received a letter from the county informing them that they were violating the Master Plan by offering a restaurant and tavern to the public, renting snowmobiles, and plowing the property's driveway to allow public access during the winter. In subsequent correspondence with the county, the Sonnetts were informed that they could face substantial penalties if they failed to comply with the Master Plan. Based on their perception that the lodge could not be operated successfully within the

2

limitations of the Master Plan, the Sonnetts closed the lodge in the summer of 2007.

*Elk Ridge Lodge, Inc. v. Sonnett*, 2011 WY 106, ¶¶ 4-7, 254 P.3d 957, 959 (Wyo. 2011).

[¶4]    Before closing the lodge, the Sonnetts sent First American a certified letter containing a "Legal Notice of Claim Without Prejudice." The Sonnetts claimed that the limitations contained in the zoning resolution (i.e., Master Plan) made the property unmarketable. The Sonnetts also claimed that there was a cloud on their title to the property because of a lack of legal access. A representative of First American responded to the Sonnetts' letter, explaining that the limitations in the resolution were not insurable pursuant to the policy because the policy specifically excluded the Sublette County Zoning Resolution and any amendments thereto from coverage. Further, First American concluded that the policy did not cover the lack of access claim. Thereafter, the Sonnetts filed a complaint against First American, claiming a breach of the terms of the title insurance policy, negligence, and bad faith.

## STANDARD OF REVIEW

[¶5]    In several of their claims on appeal, the Sonnetts allege that the district court erred when it granted summary judgment in favor of First American and dismissed the complaint. When reviewing a district court's order granting summary judgment, this Court uses the following standard of review:

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of material fact for trial. We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling.

*Herling v. Wyo. Mach. Co.*, 2013 WY 82, ¶ 24, 304 P.3d 951, 957 (Wyo. 2013) (quoting *Redland v. Redland*, 2012 WY 148, ¶ 47, 288 P.3d 1173, 1185 (Wyo. 2012)) (citations omitted).

[¶6]   As will be discussed below, the claims that do not pertain to the order on summary judgment will be disposed of on grounds that do not require an analysis of the merits of the claims.

## DISCUSSION

### Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' breach of contract claim?

[¶7]   The Sonnetts claim that First American breached the terms of the title insurance policy when it declined to cover losses the Sonnetts allege to have sustained due to the restrictions imposed upon the property by the Master Plan.  The Sonnetts argue that the Master Plan is an encumbrance on the property which renders their title unmarketable. First American asserts that the Master Plan is an amendment to the county zoning regulations and is specifically excluded from coverage under the policy.  When reviewing an insurance contract, this Court previously stated:

> This court has often stated when interpreting an insurance contract, we follow general tenets of contract construction. *Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 949 (Wyo. 1998); *Squillace v. Wyo. State Employees' and Officials' Group Ins. Bd.*, 933 P.2d 488, 491 (Wyo. 1997).  We delineated our rules of insurance contract construction in *St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist. No. 1*, 763 P.2d 1255, 1258 (Wyo. 1988) (citations omitted):
>
> > The interpretation of a written contract is done by the court as a matter of law.  An exception to construing insurance policies as other contracts has been observed by this Court where the language of the policy is ambiguous, in which case the policy must be strictly construed against the insurer.  Ambiguity, however, is not generated by a subsequent disagreement between the parties as to the meaning of the policy.  Further, the language of an insurance policy will not be "tortured" in order to create an ambiguity.
> >
> > If the policy language is clear and unambiguous, the rule of strict construction against the insurer does not apply, and the policy must be interpreted in accordance with the ordinary and usual

4

> meaning of its terms. The parties to an insurance contract are free to incorporate within the policy whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the policy.

*Hulse v. First Am. Title Co. of Crook Cnty.*, 2001 WY 95, ¶ 37, 33 P.3d 122, 134 (Wyo. 2001).

[¶8]    Here, the parties do not argue that the insurance policy is ambiguous. Both parties acknowledge that the policy insured against loss or damage due to: "1. Title to the estate or interest described in [] being vested other than as stated therein; 2. Any defect in or lien or encumbrance on the title; 3. Unmarketability of the title; [and] 4. Lack of a right of access to and from the land." The policy also clearly states that it does not insure against loss or damages resulting from "Sublette County Zoning Resolution as recorded May 12, 1970 in Book 1 of Resolutions, Page 37 and any amendments thereto." Further, the policy contained the following standard title insurance policy provision:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
>
> 1. (a)  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
>
> (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the

5

land has been recorded in the public records at Date of Policy.

[¶9]    The question is whether the Master Plan is, as the Sonnetts claim, an encumbrance on the property's title which is covered by the policy, or if it is, as First American claims, an amendment to the Sublette County Zoning Resolution and excluded from coverage. After a careful review of the Master Plan, the purpose of the plan, and how the plan is enforced, we find that it is a part of the Sublette County Zoning Resolutions and is not covered under the title insurance policy.

[¶10]  The Sonnetts assert that the Master Plan is a set of restrictive covenants and is, therefore, an encumbrance upon title.  In support of this contention, the Sonnetts point to our holding in *Granite Springs Retreat Ass'n, Inc. v. Manning*, 2006 WY 60, ¶ 11, 133 P.3d 1005, 1012 (Wyo. 2006) ("Since covenants impose restrictions upon use and enjoyment of the burdened land, they are burdens or clouds upon title.  In theory they make title less marketable, against the law's long bias in favor of unencumbered, marketable title.").  Further, they argue that in *Elk Ridge Lodge, Inc. v. Sonnett*, this Court held that the Master Plan is a set of restrictive covenants.  2011 WY 106, 254 P.3d 957 (Wyo. 2011).  In *Elk Ridge*, when laying out the underlying facts of the case, this Court described the Master Plan as "a set of restrictive covenants."  *Id*. at ¶ 4, at 959. However, the nature of the Master Plan was not at issue and whether the Master Plan was a set of restrictive covenants or something else would not have changed the outcome of the case.  This Court did not hold that the Master Plan was a set of restrictive covenants. In fact, this Court specifically pointed out that there was a question of whether the Master Plan was a zoning restriction or an encumbrance, but that the parties had not expressly raised that point and the Court was not making a determination on that point in the opinion.  *Id*. at ¶ 12, at 961 n.4.  The Court's use of the phrase "restrictive covenants" was simply an attempt to describe what purpose the Master Plan serves.  Perhaps, in hindsight, the use of the phrase was incorrect; regardless, we are not now bound to find here that the Master Plan is a set of restrictive covenants.

[¶11]  While the Master Plan certainly placed restrictions upon the use of the property, it was not done in a way that would generally create a restrictive covenant.  A restrictive covenant is defined as "[a] private agreement, usu[ally] in a deed or lease, that restricts the use or occupancy of real property, esp[ecially] by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put."  *Black's Law Dictionary* 393 (8th ed. 2004).  Further, "[e]very covenant has a burden to the covenantor and a benefit to the covenantee.  The covenantee or grantee's rights under a covenant are called the 'benefit' of the covenant, while the covenantor or grantor's duties are called the 'burden.'"  20 Am. Jur. 2d Covenants, Conditions, and Restrictions § 1, at 557 (2005).  Here, the Master Plan is neither a private agreement between a grantor and grantee, nor does it confer any sort of benefit on a grantee.

6

[¶12] Instead, the record is clear that the Master Plan was created by the previous landowners and was intended to affect only the property in question. The record equally is clear that the only purpose for the Master Plan was to gain approval for a property zoning district change from the Sublette County Planning and Zoning Commission. The previous landowners sought to change the zoning district from an agricultural to recreational district. The county received several complaints and concerns regarding the zoning change by other landowners in the area. To alleviate those concerns, and at the request of the planning and zoning commission, the previous landowners submitted the Master Plan to explain what they planned to do with the property if the zoning district was changed. Thereafter, the planning and zoning commission recommended that the zoning change be approved upon the condition that the development of the property would be in accordance with the Master Plan. The Sublette County Board of County Commissioners adopted the planning and zoning commission's recommendation and reclassified the property to a recreational district and specially referenced the need to develop the property in accordance with the Master Plan. That decision and a copy of the Master Plan was recorded at Resolution No. 89-208T as recorded May 16, 1989, in Book 2 of Resolutions at page 104. The practical implication of this process was that the original Sublette County Zoning Resolution[1] was amended by Resolution No. 89-208T, which expressly incorporated the Master Plan.

[¶13] The title insurance policy excluded from coverage governmental regulations (including zoning laws, ordinances, or regulations) restricting, regulating, prohibiting, or relating to the use and enjoyments of land. Further, the title policy specifically excluded any loss or damages related to "Sublette County Zoning Resolution as recorded May 12, 1970 in Book 1 of Resolutions, Page 37 and any amendments thereto." The Master Plan was part of a resolution that *amended* the original zoning resolution. These exclusions are routine in title insurance policies. As other courts have recognized:

> It is well established that building or zoning laws are not encumbrances or defects affecting title to property. Such restrictions are concerned with the use of land. There is a difference between economic lack of marketability, which concerns conditions that affect the use of the land, and title marketability, which relates to defects affecting the legally recognized rights and incidents of ownership. An individual can hold clear title to a parcel of land, although the same parcel is valueless or considered economically unmarketable because of some restriction or regulation on its use. A title insurance policy provides protection against defects in, or liens or encumbrances on, title. Such coverage affords no

---

[1] The original Sublette County Zoning Resolution was recorded May 12, 1970, in Book 1 of Resolutions, Page 37.

7

protection for governmentally imposed impediments on the use of the land or for impairments in the value of the land.

*Bear Fritz Land Co. v. Kachemak Bay Title Agency, Inc.*, 920 P.2d 759, 762-63 (Alaska 1996) (quoting *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 649 N.E.2d 1123, 1127-28 (Mass. 1995)); *see also Haw River Land & Timber Co. v. Lawyers Title Ins. Corp.*, 152 F.3d 275, 279 (4th Cir. 1998) ("While it is true that the Town of Garner's zoning ordinances have effectively frustrated Haw River Timber's expectation of timbering 179 of the 712 acres granted under the timber deed, thereby substantially reducing the economic value of the interest purchased, Haw River Timber raises no issue about whether it received legal title to the timber from the grantors.").

[¶14]  The Sonnetts argue that, even if the Master Plan is part of the zoning resolution, it should still be covered under the policy because it was recorded.  Although First American responds to this argument based upon the Sonnetts' argument to the district court, the Sonnetts have not provided this Court with any analysis or citation to relevant authority to support this argument on appeal.  For this reason, we decline to determine whether the recording of the Master Plan affects coverage under the policy.  *Hamburg v. Heilbrun*, 889 P.2d 967, 968 (Wyo. 1995).  We affirm the district court's decision to grant summary judgment in favor of First American regarding the breach of contract claim.

### *Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' bad faith denial of coverage claim?*

[¶15]  The Sonnetts argue that the district court erred when it granted summary judgment in favor of First American regarding their assertions that First American denied their claims for coverage under the insurance policy in bad faith.  We find that the district court did not err when it came to this conclusion.

[¶16]  This Court has found that there is a duty of good faith and fair dealing in every insurance policy between an insurer and insured.  *Gainsco Ins. Co. v. Amoco Prod. Co.*, 2002 WY 122, ¶ 12, 53 P.3d 1051, 1058 (Wyo. 2002).  The test used in determining whether a claim was denied in bad faith is an objective one which questions "whether the validity of the denied claim was not fairly debatable."  *Matlack v. Mountain West Farm Bureau Mut. Ins. Co.*, 2002 WY 60, ¶ 19, 44 P.3d 73, 81 (Wyo. 2002).  To prevail on a claim of bad faith, the Sonnetts must show:

> (1) the absence of a reasonable basis for denying benefits of the policy and (2) the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.  To satisfy the first essential component, an insured

8

must show that a reasonable insurer under the circumstances would not have acted as it did by denying or delaying payment of the claim.

*Id*. (internal citations omitted).

[¶17] The Sonnetts specifically claim that First American acted in bad faith in two regards: (1) when it determined the Master Plan was a zoning resolution and, therefore, not covered under the policy; and (2) when it denied the Sonnetts' claim for lack of legal access to the property. The crux of the Sonnetts' argument is that First American acted in bad faith when it denied coverage because the Master Plan was not a zoning resolution, but an encumbrance, and that they did not, in fact, have legal access to the property. However, this Court has determined that the Master Plan was an amendment to the zoning resolution. Further, the Sonnetts have not presented an argument to this Court that First American breached the policy agreement when it denied the lack of legal access claim. Thus, there was a reasonable basis for First American to deny the Sonnets' claims.

[¶18] Nonetheless, "even if a claim for benefits is fairly debateable, the insurer may breach the duty of good faith and fair dealing by the manner in which it investigates, handles or denies a claim." *Matlack*, 2002 WY 60, 44 P.3d at 81. The record shows that, after the Sonnetts notified First American about their claims regarding the Master Plan and right of legal access, First American responded and informed the Sonnetts that an investigation into their claims would be conducted. Further, the record includes the depositions of First American employees and representatives, who described the steps they took to investigate the Sonnetts' claims. Despite this, the Sonnetts state there was a deficient investigation and "a reckless disregard of a lack of a reasonable basis for denial" of the claims. The Sonnetts, however, have pointed to no facts in the record that support that contention. Instead, the facts presented in the record demonstrate that First American conducted an investigation into the claims and determined they were not covered under the policy. For these reasons, we affirm the district court's grant of summary judgment to First American regarding the Sonnetts' bad faith claims.

### *Did the district court err when it granted summary judgment in favor of First American regarding the Sonnetts' claims of negligence?*

[¶19] The Sonnetts assert that First American was negligent when it failed to disclose all recorded interests against the property when the title insurance policy was issued. They claim that the district court erroneously dismissed this claim when it found that Wyoming rejects tort actions where an insurance contract exists. We find that the district court's conclusion was a proper interpretation of Wyoming law and affirm its grant of summary judgment to First American regarding this claim.

9

[¶20]  In *Hulse v. First American Title Co. of Crook County*, 2001 WY 95, 33 P.3d 122 (Wyo. 2001), this Court made it clear that a title insurer does not have a tort duty to search and disclose any reasonably discoverable defects and encumbrances of title unless that duty is contained in the insurance contract.  In doing so, this Court recognized that many other jurisdictions do not impose tort liability on title insurance companies in these circumstances:

> These courts reason that because a title insurer does not purport to act as anything other than an insurance company, no tort liability exists unless the insurer has voluntarily assumed a duty of searching title for the insured's benefit in addition to the contract to insure title.  They further conclude that the issuance of a preliminary report or title commitment is not an independent assumption of a duty to search and disclose reasonably discoverable defects.  We find this reasoning persuasive especially in light of our own state statutes on the subject of title insurance.
>
> Wyo. Stat. Ann. § 26-23-303(a)(xvii) (LexisNexis 2001) defines a "commitment" as synonymous with the term "report."  If issued prior to the issuance of a policy, the commitment "constitutes a statement of the terms and conditions upon which the insurer is willing to issue its policy but is not a title policy.  Neither a title policy nor a report issued prior to the issuance of a title insurance policy is an abstract of title."  Some courts have recognized a title insurer's tort liability on the basis that the issuance of a preliminary commitment occurs weeks prior to the actual issuance of the insurance policy.  In doing so, they have equated the commitment to an abstract of title and thus the title insurance company's duty of care to that of an abstractor. *See e.g., First American Title Ins. Co., Inc. v. First Title Serv. Co. of the Florida Keys, Inc.*, 457 So.2d 467, 472-74 (Fla. 1984); *Heyd* [*v. Chicago Title Ins. Co.*], 354 N.W.2d [154,] [] 158 [(Neb. 1984)].  Wyoming statute clearly prevents this court from making that analogy.  We cannot premise a title insurer's tort liability on the mere fact of issuance of a title insurance commitment.

*Id*. at ¶¶ 41-42, at 135.

[¶21]  Like *Hulse*, First American provided title commitments that outlined the terms and conditions of the issuance of the title policy and then later issued the actual policy.  The

10

policy was a contract between First American and the Sonnetts, wherein First American promised to insure against losses or damages arising in circumstances contained in the policy. As we explained in *Hulse*, "the title company is providing not services, but a policy of insurance. That policy appropriately limits the rights and duties of the parties." *Id*. at ¶ 43, at 136. The Sonnetts have not directed this Court to any section of the policy commitments or the policy itself that contains a duty by First American to complete what amounts to a title abstract for the benefit of the Sonnetts. Thus, the district court was correct when it granted summary judgment in favor of First American and dismissed the negligence claims.

### *Remaining Claims*

[¶22] The Sonnetts also argue that the district court erred when it: (1) took judicial notice of its decision letter and order in a previous civil action; (2) struck portions of the Sonnetts' affidavits that were submitted with their motion for summary judgment; and (3) ruled on the summary judgment motions before the parties had participated in court-ordered mediation. As discussed below, we decline to consider these claims.

[¶23] With respect to the claim that the district court should not have taken judicial notice of its decision letter and order in the previous case, the Sonnetts state in subsection (a) entitled "judicial notice": "The district court erred, as a matter of law, in taking judicial notice of 'the November 30, 2009, Decision Letter and Orders Regarding Summary Judgment Motions in Civil Action No. 2008-7272.'" The brief then has a subsection (b) titled "matters 'reviewed and considered,'" which simply contains a conclusory allegation that the district court erred "when it 'reviewed and considered' the 'analysis' of facts and law" in the previous order. The Sonnets then state that the previous case dealt with language in a deed, whereas in this case the issue is the interpretation of an insurance policy, and then quotes several contract interpretation principals.

[¶24] The Sonnetts' argument regarding the district court's decision to strike portions of their affidavits is similarly sparse. They state that they have personal knowledge of the information in the affidavits, and then go on to "concede" that twelve of the paragraphs of the affidavits were inappropriate. They conclude their argument by claiming that the district court erred when it considered an affidavit submitted by First American.

[¶25] The entirety of the Sonnetts' argument regarding their claim of court-ordered mediation is as follows:

### Issue 6: Rule 40, W.R.C.P.

The district court ordered the parties to mediation then rescheduled the trial date on three occasions and entered

11

summary judgment without determining the status of mediation, which was in error.

[¶26] These "arguments," as presented by the Sonnetts, are substantively deficient. They lack any cogent argument or citation to relevant authority. Instead, they simply are conclusory allegations.

> An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case.

*Elder v. Jones*, 608 P.2d 654, 660 (Wyo. 1980). The Sonnetts' arguments fall far short of that minimum requirement. This Court has consistently held that it "need not consider issues which are not supported by proper citation of authority and cogent argument or which are not clearly defined." *Hamburg*, 889 P.2d at 968 (quoting *Young v. Hawks*, 624 P.2d 235, 238 n.2 (Wyo. 1981)). For that reason, this Court refuses to consider these issues.

## CONCLUSION

[¶27] We find that the district court properly granted summary judgment in favor of First American on all claims brought in the Sonnetts' complaint. The order of the district court is affirmed.