# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 40

**APRIL TERM, A.D. 2024**

**April 10, 2024**

V. KATHIE BRAZINSKI; CASE M.
BROWN; MARGARET E. CREEL;
JOSEPH M. DEMARSH; JAN
DEMARSH-LOVETT; LLOYD
DORSEY and MICHELE W. DORSEY,
Trustees of the Dorsey Revocable Trust
dated 12/5/2012; MARK LOVETT;
ALLISON F. MERRITT; and JANICE
K. SMITH, Trustee of the William R.
and Janice K. Smith Revocable Trust,
dated 3/15/2005,

Appellants
(Petitioners),

v.                                                            S-23-0157

BOARD OF COUNTY
COMMISSIONERS OF TETON
COUNTY, WYOMING,

Appellee
(Respondent),

and

STAGE STOP, INC.,

Appellee
(Intervenor/Respondent).

*Appeal from the District Court of Teton County*
The Honorable Melissa M. Owens, Judge

*Representing Appellants:*
William P. Schwartz, Leah C. Schwartz of Ranck & Schwartz, LLC, Jackson, Wyoming. Argument by Ms. Schwartz.

*Representing Appellee Board of County Commissioners of Teton County:*
Abigail S. Moore, Deputy County Attorney, Jackson, Wyoming.

*Representing Appellee Stage Stop, Inc.:*
Brandon L. Jensen, Rachael L. Buzanowski of Budd-Falen Law Offices, LLC, Cheyenne, Wyoming. Argument by Mr. Jensen.

*Before FOX, C.J., and KAUTZ,\* BOOMGAARDEN, GRAY, and FENN, JJ.*

*\* Justice Kautz retired from judicial office effective March 26, 2024, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), he was reassigned to act on this matter on March 27, 2024.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    V. Kathie Brazinski, Case M. Brown, Margaret E. Creel, Joseph M. DeMarsh, Jan DeMarsh-Lovett, Mark Lovett, Allison F. Merritt, Lloyd Dorsey and Michele W. Dorsey, as Trustees of the Dorsey Revocable Trust, and Janice K. Smith, as Trustee of the William R. and Janice K. Smith Revocable Trust (hereinafter referred to collectively as Objectors) were residents of the Rafter J Ranch (Rafter J) Subdivision in Teton County.  They appeal the Teton County Board of County Commissioners' (Board) approval of Intervenor Stage Stop, Inc.'s petition to amend the Rafter J Planned Unit Development (PUD) to allow Stage Stop to use Lot 333 of the Rafter J Subdivision for workforce apartments.  We affirm.

## ISSUES

[¶2]    The issues raised on appeal are:

1.  Is the Board's approval of the Rafter J PUD Amendment subject to judicial review?

2.  Did the Board err by allowing the Rafter J PUD Amendment to change the use on Lot 333 without requiring a vacation of the Rafter J Subdivision Plat (Plat)?

3.  Was the Board's approval of the Rafter J PUD Amendment to allow workforce apartments as a conditional use of Lot 333 arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law?

## FACTS

[¶3]    The Board approved the Rafter J Subdivision in 1977, and the Plat was recorded in early 1978.  The Rafter J Subdivision, which encompassed 447.83 acres, was divided into lots with uses designated in the notes on the Plat (Plat Notes), including mostly single residence lots, a few lots labeled for multiple dwellings, and a few lots set aside for facilities providing services and amenities to the Subdivision.  Lot 333, containing 5.37 acres, was designated in the Plat Notes as "Ranch Headquarters & Local Commercial."

[¶4]    When the Board approved the Rafter J Plat in 1977, Teton County did not have a comprehensive land use plan.  However, after the Board approved Rafter J, it adopted a comprehensive plan and land development regulations in 1978 (1978 LDRs).  Although the 1978 LDRs recognized PUDs, there was no formal PUD zone or application process; instead, "PUDs were often reviewed as part of the Subdivision [P]ermit or Development Plan."  The purpose of a PUD, according to the 1978 LDRs, was to "encourage clustering of residential development to achieve preservation of open space and scenic areas[.]"  PUD

1

zones were officially recognized in later versions of the LDRs, which explained that PUD "zones permit variation from the strict application of the zones in order to achieve specific community goals that enhance the community's implementation of the Jackson/Teton County Comprehensive Plan. The intent of PUD zones is that large or complex developments under unified control be planned as a single, continuous project with greater design flexibility." LDR § 4.4.1.A.

[¶5] Although the Rafter J Subdivision was formed before Teton County officially adopted PUD zones, subsequent versions of the LDRs designated the Rafter J Subdivision as a PUD. Until the current dispute, no one objected to the designation of Rafter J as a PUD. Under current LDR 8.7.3.E, "[a]pproval of a PUD constitutes a zoning map amendment that has the effect of applying the master plan as the zone-specific standards for the site." LDR 4.4.1.C.2 sets out the requirement for a PUD to have a master plan:

> A PUD shall include . . . a master plan that establishes the general configuration and relationship of the principal elements of the proposed development and specifies terms and conditions defining development parameters, including uses, general building types, density/intensity, resource protection, pedestrian and vehicular circulation, open space, public facilities, and phasing.

Because the Rafter J Subdivision predated the PUD zone designation, it did not have "a formal Master Plan." Consequently, the Teton County Planning Staff (Planning Staff) used the Plat Notes as the "PUD guiding documents" "equivalent to a [M]aster [P]lan." Again, no one contested the use of the Plat Notes as the Rafter J PUD Master Plan until this dispute arose.

[¶6] The Plat Notes designated Lot 333 as "Ranch Headquarters & Local Commercial." The Planning Staff determined the "Local Commercial" Plat Note subjected Lot 333 to Local Convenience Commercial (CL) zoning district standards, which permitted uses "intended to serve the day to day needs of local residents." "Institutional use" was one of the conditional uses allowed under the CL standards. In 1998, the Board approved an application to construct a 50,000 square foot assisted-living facility on Lot 333 as a conditional institutional use. The assisted-living facility operated from 2004, when construction was completed, until 2021, when it shut down during the COVID-19 pandemic.

[¶7] In 2021, Stage Stop purchased Lot 333 and applied for an amendment to the PUD and a conditional use permit (CUP) to convert the assisted-living facility to workforce apartments. The Planning Staff prepared a report on Stage Stop's application which stated "[u]nder the current standards of the Rafter J PUD, Lot 333 is subject to the uses and standards of the [CL] District of the 1978 LDRs." Under the CL standards and the

2

underlying Rural-3 zoning, use of Lot 333 for apartments was not permitted as a conditional use. However, the LDRs provided a process to amend a PUD to allow apartments as a conditional use.

[¶8] The Planning Staff also recognized the PUD option was no longer available for new developments in Teton County, but the LDRs continued to allow amendments to existing PUDs. "Therefore, [Stage Stop was] seeking to amend the Rafter J PUD to include an allowance for apartments [as a conditional use] on this lot only[.]" After two public hearings, at which residents of the Rafter J Subdivision, including the Objectors, voiced their concerns, the Planning Commission recommended the Board approve Stage Stop's request for a PUD amendment to allow apartments as a conditional use on Lot 333.

[¶9] The Board held two additional public hearings, and the Objectors and other Rafter J Subdivision residents again contested changing the PUD to allow workforce apartments. The Board approved Stage Stop's request to amend the Rafter J PUD to allow apartments for the "Teton County Workforce" as a primary conditional use on Lot 333.

[¶10] The Objectors petitioned the district court for review of the Board's decision, and the district court allowed Stage Stop to intervene. The district court affirmed the Board's decision, and the Objectors then appealed to this Court.

## STANDARD OF REVIEW

[¶11] The Board is an administrative agency governed by the Wyoming Administrative Procedure Act (WAPA). Wyo. Stat. Ann. § 16-3-101(b)(i) (LexisNexis 2023). "We review an agency's decision as if it came directly to us, without giving any deference to the district court decision." *Tayback v. Teton Cnty. Bd. of Cnty. Comm'rs,* 2017 WY 114, ¶ 12, 402 P.3d 984, 987 (Wyo. 2017) (citing *Hardy v. State ex rel. Dep't of Workforce Servs.*, *Workers' Comp. Div.,* 2017 WY 42, ¶ 10, 394 P.3d 454, 457 (Wyo. 2017)). Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2023) governs judicial review of agency actions:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

3

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶12] In accordance with the LDRs, the Board held informal public hearings on Stage Stop's application. Unlike contested case hearings which follow an adversarial process, the witnesses at the public hearings were not sworn or subject to cross-examination and comments were taken from members of the audience. *See Tayback,* ¶ 13, 402 P.3d at 988. "Given the informality of the proceedings, we review the Board's decision using § 16-3-114(c)(ii)(A)" and will set aside its decision only if it is "'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'" *Tayback,* ¶ 12, 402 P.3d at 988 (quoting § 16-3-114(c)(ii)(A), and citing *Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs,* 2012 WY 163, ¶ 20, 292 P.3d 855, 861 (Wyo. 2012)).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Wilson Advisory Comm.,* ¶ 21, 292 P.3d at 861 (citations omitted). "As always, we review an agency's conclusions of law *de novo* and affirm only when they are in accordance with the law." *Tayback,* ¶ 14, 402 P.3d at 988 (citing *Wilson Advisory Comm.,* ¶ 22, 292 P.3d at 862, and *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue,* 2017 WY 6, ¶ 15, 387 P.3d 725, 730 (Wyo. 2017)) (other citation omitted).

## DISCUSSION

### *Judicial Review*

[¶13] The Board argues its decision granting the Rafter J PUD Amendment is not subject to judicial review under the WAPA. Section 16-3-114(a) states "in the absence of any statutory or common-law provision precluding or limiting judicial review, any person

4

aggrieved or adversely affected in fact by . . . agency action or inaction . . . is entitled to judicial review[.]"[1]  The Board claims judicial review of its decision is precluded because, under the common law, zoning is a legislative action and legislative decisions are not subject to judicial review under the WAPA.  *See Campbell Cnty. Bd. of Comm'rs v. Wyo. Horse Racing, LLC,* 2023 WY 10, ¶ 12, 523 P.3d 901, 905 (Wyo. 2023); *Holding's Little Am. v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 670 P.2d 699, 702 (Wyo. 1983).

[¶14]  In *McGann v. City Council of City of Laramie,* 581 P.2d 1104, 1105 (Wyo. 1978), the Laramie City Council passed an ordinance amending the zoning classification of a large parcel of land "to allow for the construction of a proposed shopping center."  Owners of homes adjacent to the rezoned area objected to the council's decision and petitioned the district court for review.  *Id.*  We ruled that, because the council's power to zone or rezone was delegated to it by the state legislature, the zoning ordinance was a legislative action and the WAPA does not provide a right to judicial review of legislative actions.  *Id.* at 1105-06.

[¶15] We followed *McGann* in *Sheridan Planning Ass'n v. Bd. of Sheridan Cnty. Comm'rs,* 924 P.2d 988, 990 (Wyo. 1996), and ruled the Sheridan County Commissioners' approval of the Powder Horn Subdivision PUD was a non-reviewable legislative act.  We said "amendments to zoning laws are legislative acts and, as such, are not reviewable."  *Id.* (citing *McGann,* 581 P.2d at 1106).  Since "the approval of a PUD plat is tantamount to amending zoning regulations and is, therefore, a legislative act, . . . [it] is not reviewable under the [WAPA]."  *Id.* (citing *McGann,* 581 P.2d at 1106-07, and *Jurkiewicz v. Butler Cty. Bd. of Elections,* 620 N.E.2d 146, 147 (Ohio Ct. App. 1993)).  Following this precedent, approval of a PUD amendment also has the effect of amending the zoning regulations and, therefore, falls under the category of non-reviewable legislative acts.

[¶16]  The Objectors argue the Board's amendment of the Rafter J PUD in this case is not properly characterized as a legislative act and was, instead, an adjudicatory decision concerning a single tract of land, which is reviewable under the WAPA.[2]  *See Wyo. Horse Racing, LLC,* ¶¶ 12-13, 523 P.3d at 906.  We said in *Wyo. Horse Racing* that a court

---

[1] Without raising a separate issue, Stage Stop makes a short argument at the end of its brief that the Objectors do not have standing to bring this appeal because they are not "aggrieved or adversely affected" under Wyo. Stat. Ann. § 16-3-114(a).  Given our decision in this case, it is unnecessary for us to consider this argument.

[2] In a single sentence and footnote at the end of their opening brief, the Objectors argue the Rafter J PUD Amendment was improper "spot zoning" and should be invalidated.  We have not addressed the "spot zoning" concept other than to define it in a footnote in *Laughter v. Bd. of Cnty. Comm'rs of Sweetwater Cnty.,* as occurring when "'a particular piece of land [is zoned] without regard for the zoning of the larger area surrounding the land.'"  *Id.,* 2005 WY 54, ¶ 41 n.15, 110 P.3d 875, 887 n.15 (Wyo. 2005) (quoting *Black's Law Dictionary* 1650 (8th ed. 2004)).  The Objectors' terse introduction of the topic in this case is insufficient to warrant review by this Court.  *See Mills v. State,* 2023 WY 76, ¶ 19 n.2, 533 P.3d 182, 189 n.2 (Wyo. 2023) ("[w]e refuse to consider issues unsupported by cogent argument or citation to pertinent authority" (citing *Best v. State,* 2022 WY 25, ¶ 9, 503 P.3d 641, 644 (Wyo. 2022))).

5

typically determines whether an agency's action was legislative by comparing it to adjudicatory proceedings. *Id.,* ¶ 12, 523 P.3d at 905 (citing *Holding's Little Am.,* 670 P.2d at 702). "When an agency acts legislatively, it tends to 'produce[ ] a general rule or policy which applies to a general class of individuals, interests, or situations.' Whereas the agency's 'adjudicatory functions [typically] apply . . . to identifiable persons and specific situations.'" *Id.* (quoting *Holding's Little Am.*, 670 P.2d at 702, and citing 1 Am.Jur.2d *Administrative Law* § 164).

[¶17] In *McGann* and *Sheridan Planning Ass'n,* we did not apply the legislative/adjudicatory dichotomy to the specific zoning decisions at issue; instead, we simply ruled zoning decisions are legislative in nature and, therefore, unreviewable. *McGann,* 581 P.2d at 1106; *Sheridan Planning Ass'n,* 924 P.2d at 990. We need not decide whether an amendment of a PUD is always an unreviewable legislative action or whether we should apply the legislative/adjudicatory dichotomy to determine whether it is reviewable because the Objectors simply ask us to determine whether the Board followed its rules and regulations in approving the Rafter J PUD Amendment.

[¶18] In *Sheridan Planning Ass'n,* 924 P.2d at 990-91, we recognized that, although the Sheridan County Commission's approval of the Powder Horn PUD was a non-reviewable legislative action*,* it was appropriate to consider the appellant's claim that the commission did not follow its rules and regulations in approving the PUD. Similarly, in *Hoke v. Moyer,* 865 P.2d 624, 629-31 (Wyo. 1993), we reviewed the county commission's zoning amendment increasing the development density in a certain area to determine whether the commission followed statutory and regulatory requirements for such amendments. Given this history, courts clearly have a role in determining whether an agency followed its rules and regulations in making a zoning decision. We will, therefore, review the Objectors' claims that the Board violated its rules and regulations when it approved the Rafter J PUD Amendment.

*Vacation of Plat*

[¶19] The Objectors maintain the Board erred by using the PUD amendment process to change the Plat Note designating Lot 333 as "Ranch Headquarters and Local Commercial." They assert that, to change the use specified on the Plat from "local commercial" to high-density residential for workforce apartments, Stage Stop should have been required to comply with the statutory process for vacating the Plat.

[¶20] To determine whether the Board's decision constituted an amendment to the Plat, or only a change in the PUD zoning for Lot 333, or both, it is useful to review the law pertaining to amendment or vacation of plats and restrictive covenants.

[¶21] Wyo. Stat. Ann. § 34-12-102 (LexisNexis 2023) sets out the process for platting a subdivision:

Every original owner or proprietor of any tract or parcel of land, who . . . shall . . . subdivide . . . shall cause a plat of such subdivision . . . to be made, which shall accurately describe all the subdivisions of such tract or parcel of land, numbering the same by progressive numbers, and giving the dimensions, and length and breadth thereof, and the breadth and courses of all the streets and alleys established therein.

[¶22]  "'[A] developer can create covenants in favor of all landowners by clearly including restrictions [on the properly recorded] plat . . . .'" *Reichert v. Daugherty,* 2018 WY 103, ¶ 12, 425 P.3d 990, 994 (Wyo. 2018) (quoting 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 158 (Aug. 2018 update)).  *See also, Brumbaugh v. Mikelson Land Co.*, 2008 WY 66, ¶ 26, 185 P.3d 695, 704 (Wyo. 2008) (the subdivision plat and declaration of covenants establish property rights and restrictions).  "A restrictive covenant is defined as '[a] private agreement . . . that restricts the use or occupancy of real property, esp[ecially] by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put.'" *Sonnet v. First Am. Title Ins. Co.,* 2013 WY 106, ¶ 11, 309 P.3d 799, 805 (Wyo. 2013) (quoting *Black's Law Dictionary* 393 (8th ed. 2004)).  "'[E]very covenant has a burden to the covenantor and a benefit to the covenantee.  The covenantee or grantee's rights under a covenant are called the "benefit" of the covenant, while the covenantor or grantor's duties are called the "burden."'"  *Id.* (quoting 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1, at 557 (2005)).  Restrictive covenants which run with the land "'inure[] to the benefit of, or must be fulfilled by, whatever party holds the land at the time when fulfillment is due.'"  *Reichert,* ¶ 13, 425 P.3d at 994 (quoting *Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 12 n.4, 191 P.3d 125, 130 n.4 (Wyo. 2008)).

[¶23]  To remove the contractual benefits and burdens of restrictions on a recorded plat, all landowners must agree to vacate the plat:

Any such plat may be vacated by the proprietors thereof at any time before the sale of any lots therein, by a written instrument declaring the same to be vacated, . . . and *in case where any lots have been sold, the plat may be vacated as herein provided, by all the owners of lots in such plat joining in the execution of the writing aforesaid. . . .*

Wyo. Stat. Ann. § 34-12-106 (LexisNexis 2023) (emphasis added).  Wyo. Stat. Ann. § 34-12-108 (LexisNexis 2023) specifically addresses partial vacation of a plat:

Any part of a plat may be vacated under the provisions, and subject to the conditions of this act; provided, such vacating does not abridge or destroy any of the rights and privileges of

7

other proprietors in said plat; and provided, further, that nothing contained in this section shall authorize the closing or obstruction of any public highways laid out according to law.

[¶24]  *Carnahan v. Lewis,* 2012 WY 45, 273 P.3d 1065 (Wyo. 2012), provides an example of how the statutory plat vacation process works.  The developer platted a subdivision and dedicated certain easements to the public for use as roads.  *Id.,* ¶ 4, 273 P.3d at 1068.  The Griffiths purchased a number of contiguous lots in the subdivision and filed an affidavit purporting to vacate various aspects of the subdivision plat, including the public easement across their property and the internal lot lines to effectively consolidate their property into one large parcel.  *Id.,* ¶ 5, 273 P.3d at 1068.  They did not obtain the approval of other subdivision owners.  *Id.,* ¶ 38, 273 P.3d at 1076-77.

[¶25]  The Carnahans purchased the Griffiths' property and, apparently relying on the Griffiths' affidavit vacating the public easement on the property, built a fence across it.  *Id.,* ¶¶ 8-9, 273 P.3d at 1069.  The Lewises owned the neighboring property and wanted to use the public easement blocked by the Carnahans.  *Id.*  The Lewises filed suit seeking a declaration that the Carnahans could not build a fence obstructing the public easement because the Griffiths were not authorized to unilaterally vacate the public easement shown on the plat after lots in the subdivision had been sold.  *Id.,* ¶ 1, 273 P.3d at 1067.  We held all of the subdivision lot owners had a vested interest in the platted public road.  *Id.,* ¶¶ 38-39, 273 P.3d at 1076-77.  Under § 34-12-106, the Griffiths could not vacate the plat without the agreement of all of the lot owners.  *Id.,* ¶¶ 37-38, 273 P.3d at 1076-77.  By unilaterally vacating the public easement and then blocking it, the Griffiths and Carnahans violated the Lewises' vested rights.  *Id.,* ¶ 39, 273 P.3d at 1077.

[¶26]  We have recognized many times that "'zoning ordinances cannot override, annul, abrogate, or relieve land from [contractual] building restrictions or covenants placed upon [it].'"  *Wimer v. Cook,* 2016 WY 29, ¶ 26, 369 P.3d 210, 220 (quoting *Anderson v. Bommer,* 926 P.2d 959, 963 (Wyo. 1996), and citing *Fox v. Miner,* 467 P.2d 595, 597 (Wyo. 1970)).  In other words, land in a subdivision may be subject to both zoning and contractual building restrictions.  An amendment to zoning has no effect on any contractual building restrictions or restrictive covenants.  Approval of a land use plan by the county zoning authority does not override a violation of the covenants, which can be enforced in a private action between landowners.  *Id.*  Moreover, a county has no authority to vacate or partially vacate any plat use restriction without approval of all the landowners.  It is neither the "county's duty [nor] right to vacate the subdivision plat."[3]  *Laughter v. Bd. of Cnty. Comm'rs for Sweetwater Cnty.,* 2005 WY 54, ¶ 50, 110 P.3d 875, 890 (Wyo. 2005).

---

[3] We do not mean that county commissions have no role in approving subdivision plats or the vacation thereof.  *See, e.g.,* § 34-12-103 (requiring county commission approval of subdivision plat), and § 34-12-106 (requiring county commission approval for full or partial vacation of subdivision plat).  Our point is that county commissions cannot do so without landowner approval.

8

[¶27]   The Planning Staff recognized in its report to the Board on Stage Stop's application that the County's authority was limited to dealing with zoning/PUD conditions.  "[T]he Board of County Commissioners, and by proxy the Planning & Building Services Department, are not responsible for enforcing . . . private documents.  Specifically, LDR Section 1.6.6 states:  'Nothing in these LDRs is intended to supersede, annul, or interfere with any easement, covenant, deed restriction, or other agreement between private parties, but such agreements shall not excuse a failure to comply with these LDRs.  The County shall not be responsible for monitoring or enforcing private agreements.'"

[¶28]   Thus, the Objectors are correct that, under Wyoming statutes and our precedent, Stage Stop would have been required to follow the process for partially vacating the Plat if it sought to erase the Objectors' contractual rights to the "local commercial" designation on the Plat for Lot 333.  Such a change would have required the approval of the subdivision lot owners.

[¶29]   However, the Board's decision in this case did not change the Plat; it only addressed zoning.  As we explained above, the planning and zoning department and the LDRs designated Rafter J as a PUD and adopted the Plat Notes as the Master Plan for the Rafter J PUD.  Therefore, under the unique facts of this case, the Plat Notes served dual functions: 1) they were a contract between subdivision landowners which could be enforceable by a private landowner action; and 2) they served as a regulatory land use planning device, i.e., the PUD Master Plan.  The Board's decision did not affect the first function and it did not vacate any contractual restrictions shown on the Rafter J Plat.  The Board's decision affected only the second function of the Plat Notes, i.e., as the PUD Master Plan zoning device.  Because the Board's decision addressed its zoning authority and did not change the contractual rights and duties between the landowners, a plat vacation was not required.  Like in *Carnahan* and *Wimer,* the Objectors have a right to bring a declaratory judgment action against Stage Stop to protect their contractual rights to the "Local Commercial" designation on the Plat for Lot 333.[4]

### *Review of Board's Administrative Decision*

[¶30]   The Objectors claim the Board's approval of the Rafter J PUD Amendment to allow use of Lot 333 for apartments was arbitrary, capricious, and contrary to law because it did not follow the LDRs.  The LDRs are agency rules and regulations which "'have the force and effect of law[.]'"  *Wilson Advisory Comm.,* ¶ 22, 292 P.3d at 862 (quoting *Northfork Citizens for Responsible Dev. v. Bd. of Cnty. Comm'rs of Park Cnty.,* 2010 WY 41, ¶ 27, 228 P.3d 838, 848 (Wyo. 2010)) (other citation omitted).  An administrative agency must follow its own rules and regulations or face reversal of its action.  *Id.* (quotation marks and

---

[4] The Objectors inform us in their opening brief that "[a]fter Stage Stop failed to give assurances that it would properly seek to amend the Covenants, the [Rafter J Homeowners Association] filed a separate action against Stage Stop for anticipatory breach of the Covenants, which is currently pending in the district court."

citation omitted). In general, "we defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules." *Powder River Basin Res. Council v. Wyo. Dept. of Env't Quality,* 2010 WY 25, ¶ 6, 226 P.3d 809, 813 (Wyo. 2010).

[¶31] The Objectors assert the Board's decision was incorrect because Stage Stop's application requested an amendment of the text of the 1978 LDRs, and the Board did not follow the process for amending the text of LDRs set out in LDR 8.7.1. However, the Objectors also assert that the Board could not have used LDR 8.7.1. to amend the 1978 LDRs because that provision governs amendment of the current version of the LDRs, not the 1978 LDRs which had long ago been repealed. This argument has no merit because, while it is accurate that Stage Stop's original application requested amendment of the 1978 LDRs to allow it to use Lot 333 for apartments, the Board did not amend the 1978 LDRs. Instead, it amended the Rafter J PUD, relief which Stage Stop also requested in its application and which is allowed under the LDRs. It is nonsensical to argue the Board erred by deciding not to take an action the Objectors claim the Board had no authority to take.

[¶32] The Objectors next assert the Board did not follow the proper procedure for amending the PUD. LDR 8.2.13.D governs PUD amendments and states in relevant part:

> An amendment to an existing PUD . . . shall be reviewed and approved pursuant to Sec. 8.7.3. . . .
>
> 2. PUD Option No Longer Available. An amendment to an existing PUD . . . for which the original PUD option is no longer available shall:
>     a.    Improve the implementation of the desired future character of the area identified in the Jackson/Teton County Comprehensive Plan;
>     b.    Comply with the requirements for the underlying base zoning to the maximum extent practicable;
>     c.    Compl[y] with the standards for the Natural Resource Overlay (NRO) and Scenic Resources Overlay (SRO), if applicable; and
>     d.    Not adversely impact public facilities and services, including transportation, potable water and wastewater facilities, parks, schools, police, fire and EMS facilities.

LDR 8.2.13.D refers to LDR 8.7.3, which sets out the procedural requirements for PUD adoption.

[¶33]   The Objectors claim the Board did not properly consider LDR 8.2.13.D when ruling on Stage Stop's request to amend the Rafter J's PUD.  As evidence for their position, the Objectors point out that the recorded PUD Amendment and the cover page certifying the Amendment refer only to LDR 8.7.3, which governs the procedures for adopting new PUDs, and not to LDR 8.2.13.D, which specifically governs PUD amendments.  As is apparent from the quote above, LDR 8.2.13.D adopts the procedural requirements set out in LDR 8.7.3.  The cover page referred to LDR 8.7.3 when describing the public notice and hearings employed by the Board in approving the PUD Amendment.  The Objectors do not point to any regulatory or statutory requirement for the Board to refer to or provide specific findings under LDR 8.2.13.D in the recorded PUD Amendment.  In the absence of cogent argument and citation to pertinent authority, we will not consider the Objectors' claim.  *See Mills*, ¶ 19 n.2, 533 P.3d at 189 n.2.

[¶34]   The Objectors' final claim is that the Board did not properly consider LDR 8.2.13.D.2.b, which required that the PUD Amendment comply with the underlying base zoning to the maximum extent practicable.  The record belies the Objectors' argument.

[¶35]   The Board approved the PUD Amendment "based on the [P]lanning [S]taff's recommended findings."  The staff report included the following finding regarding LDR 8.2.13.D.2.b:

> *b.  Comply with the requirements of the underlying base zoning to the maximum extent practicable;*
> **Complies.**  The existing PUD standards for this lot (the CL District of the 1978 LDRs) have very little overlap with the underlying base Rural-3 zoning.   Local Convenience Commercial allows a variety of non-residential (recreational, retail commercial, service, industrial, office, institutional, etc.) uses intended to serve the day to day needs of local residents that are not permitted in the Rural-3 zone.  Rural-3 allows for primarily single-family residential and agricultural uses with some accessory use options.  Therefore, it is impracticable to apply standards for the Rural-3 zone that are already inconsistent with the current PUD standards and would continue to be inconsistent with the amendment.  Underlying zoning applies within a PUD where the PUD standards are silent.  In this case[,] the Rafter J PUD already implements the standards from the 1978 CL District zoning, and therefore it is most practicable to look at those regulations for consistency rather than Rural-3 when considering a PUD amendment.  The proposed workforce housing will support the day to day needs of local residents by supporting the employees of local

11

businesses and institutions that local residents rely on for services.

A Planning Staff member gave a similar explanation of the staff's recommendation on factor b. at the public hearing.

[¶36]  The Planning Staff's recommendation presented a reasoned approach to the unique situation involving Lot 333 in the Rafter J Subdivision, and the Board adopted that recommendation.  The Rafter J Subdivision had been treated as a PUD for decades without objection.  Because the Rafter J Subdivision did not have an official Master Plan, the Planning Staff historically considered the Plat Notes as the Master Plan, a choice that, again, was not contested by the Rafter J landowners until this matter.  The Plat Notes stated Lot 333 was for "Ranch Headquarters & Local Commercial."  In order to fit Lot 333 into the Teton County zoning system, the Planning Staff considered the Plat Note of "local commercial" as falling under the CL zoning district.  The CL zoning district recognized industrial use as a conditional use.  The Board approved the 50,000 square foot assisted-living center as a conditional industrial use on Lot 333 in 1998, construction was completed in 2004, and it continued to operate as an assisted-living center through 2021.

[¶37]  The Planning Staff and the Board properly recognized that the CL zoning district which applied to Lot 333 did not include apartments as a conditional use.  Consequently, when Stage Stop acquired Lot 333 in 2021, it had to apply for a PUD Amendment to allow apartments as a conditional use.  In light of the unique circumstances of Rafter J's zoning and the historical use of Lot 333, it was reasonable for the Board to allow Stage Stop to use the PUD amendment process available under the LDRs.  The Board followed the PUD amendment process outlined in LDR 8.2.13.D and accepted the Planning Staff's findings on the criteria contained therein, including L.D.R. 8.2.13.D.2.b, to approve the PUD Amendment which allowed apartments as a conditional use on Lot 333.  The Board had a rational basis for its decision, and the Objectors have not shown the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## CONCLUSION

[¶38]  The Board's approval of the Rafter J PUD Amendment is subject to judicial review to determine whether the Board followed its rules and regulations.  Using the Plat Notes as the PUD Master Plan and the applicable LDRs, the Board properly considered Stage Stop's request to amend the Rafter J PUD.  The Board's administrative decision had no effect on any private contractual rights which the Objectors may have from the Plat restrictions.  The Board followed the LDRs and made reasonable choices in approving the Rafter J PUD Amendment.

[¶39]  Affirmed.

12